# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DMK PHARMACEUTICALS CORP., *et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10153 (MFW)<br>(Jointly Administered) |
| DMK PHARMACEUTICALS CORP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>USWM, LLC,<br><br>Defendant. | Adv. Pro No. 24-_____ |

## **COMPLAINT**

Debtors in the above-captioned jointly administered chapter 11 cases and plaintiffs herein, DMK Pharmaceuticals Corporation ("DMK") and Adamis Pharmaceuticals Corporation ("Adamis Pharma") (DMK and Adamis Pharma are collectively referred to as "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint against USWM, LLC ("USWM"), and state as follows:

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) DMK Pharmaceuticals Corporation ("DMK") (9727) (ii) Adamis Corporation ("Adamis") (4912); (iii) Adamis Pharmaceuticals Corporation ("Adamis Pharma") (9663); (iv) Biosyn, Inc. ("Biosyn") (4982); (v) Rhombus Pharmaceuticals Corp. ("Rhombus") (6127); and (vi) US Compounding, Inc. ("USC") (7460) (collectively referred to as the "Debtors"). The Debtors' mailing address is: 50 Division Street, Suite 501, Somerville, NJ 08876, with copies to Nelson Mullins Riley & Scarborough LLP, Attn: Lee Hart, Atlantic Station, Suite 1700, 201 17th Street NW, Atlanta, GA 30363; and Gellert, Seitz, Busenkell & Brown LLC, Attn: Michael Busenkell, 1201 N. Orange Street, Suite 300, Wilmington, DE 19801.

1

## NATURE OF THE ACTION

1. Plaintiff Adamis Pharma entered into a Distribution and Commercialization Agreement with USWM on May 11, 2020 (the "Agreement") regarding, in part, ZIMHI, an injectable naloxone product approved by the Food and Drug Administration for treatment of opioid emergencies. Defendant served as the exclusive distributor for ZIMHI in the United States, and was required to develop a commercialization plan and use commercially reasonable efforts to execute that plan. Instead, USWM breached the contract with Plaintiffs by failing to use commercially reasonable efforts to commercialize ZIMHI, which resulted in substantial damages to Plaintiffs, ultimately requiring Plaintiffs to file the instant Chapter 11 matter.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this Chapter 11 adversary proceeding pursuant to 28 U.S.C. § 1334(b).

3. On April 17, 2024, USWM filed a Proof of Claim in against DMK's bankruptcy estate seeking an unsecured claim in the amount of $9,040,615.37 [Claim No. 74] (the "Claim").

4. Due to its filed Claim, USWM has submitted to the jurisdiction of the Bankruptcy Court with respect to the claims and causes of action asserted herein.

5. Venue of this adversary proceeding is proper in this District pursuant to 28 U.S.C. § 1409(a).

6. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7. Pursuant to Bankruptcy Rule 7008, the Plaintiffs consent to the entry of final orders and final judgments in this adversary proceeding.

**PARTIES**

8.  Plaintiff, DMK, is a Delaware corporation, having its principal place of business at 11622 El Camino Real, Suite 100, San Diego, California 92103.

9.  Plaintiff, Adamis Pharma, was a Delaware corporation, having its principal place of business at 11622 El Camino Real, Suite 300, San Diego, California 92103.

10. On May 25, 2023, Adamis Pharma and DMK merged with and into Aardvark Merger Sub, Inc., the name of which was subsequently changed to DMK Pharmaceuticals Corporation.

11. Defendant, USWM, is a Delaware limited liability company, having its principal place of business at 4441 Springdale Road, Louisville, Kentucky 40241.

**PROCEDURAL BACKGROUND**

12. On February 2, 2024 (the "Petition Date"), the DMK and its affiliated subsidiaries including without limitation, Adamis Pharma, (collectively, the "Debtors") filed separate voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession, pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

13. Pursuant to an order entered by the Court on February 6, 2023, the Debtors' estates are being jointly administered, as provided for in Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") [D.I. 23].

14. On February 20, 2024, an official committee of unsecured creditors (the "Committee") was formed in these Chapter 11 Cases [D.I. 56].

15. USWM serves as a member of the Committee.

16. To date, no request has been made for the appointment of a trustee or an examiner.

17. On March 1, 2024, DMK [D.I. 96] and Adamis Pharma [D.I. 96] filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements").

18. In its Schedules and Statements, DMK scheduled a contingent, unliquidated and disputed claim for USWM in the amount of $199,938.47 in respect of "manufacturing services." *See* D.I. 96, at p. 33.

## FACTUAL BACKGROUND

19. The National Center for Health Statistics at the Centers for Disease Control and Prevention collects information on deaths involving drugs commonly associated with fatal overdose. The NCHS has reported that opioid-involved overdose deaths rose from 49,860 in 2019 to 81,806 in 2022. *See* https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates.

20. The United States Department of Health and Human Services ("DHHS") has identified naloxone distribution as one of the top three strategies for addressing the opioid epidemic.

21. The United States Surgeon General has called naloxone a "safe antidote" to a suspected opioid overdose, and has urged more individuals to carry naloxone, including family, friends, and community members. *See* https://www.hhs.gov/surgeongeneral/reports-and-publications/addiction-and-substance-misuse/advisory-on-naloxone/index.html.

22. In 2020, the estimated commercial naloxone market in the United States was approximately $430 million in annual sales.

23. In 2022, the estimated commercial naloxone market in the United States had climbed to approximately $532.7 million in annual sales.

24. By 2032, the estimated commercial naloxone market in the United States is estimated to reach approximately $1.4 billion, applying a compound annual growth rate of 10.1%.

25. Purchases of naloxone come from a variety of groups, including first responders (such as police officers and firefighters), paramedics, emergency medical services, emergency departments, health care providers, pharmacies, syringe exchange programs, homeless shelters, social service agencies, libraries, and substance use disorder treatment programs.

26. Over the last decade the prevalence of fentanyl poisoning has increased and in 2022, almost 90% of opioid related deaths were due to synthetic opioids such as fentanyl.

27. Combatting harmful levels of synthetic opioids, such as fentanyl, with naloxone requires the rapid administration of high doses of it. This is better achieved through an intramuscular route of administration, than through intra-nasal delivery (the standard of care).

28. ZIMHI is the only commercially available, FDA-approved intramuscular naloxone product on the United States market.

29. ZIMHI is an opioid antagonist indicated for the emergency treatment of known or suspected opioid overdose and fentanyl poisonings. ZIMHI is intended for immediate administration as an emergency therapy in settings where opioids and/or fentanyl may be present. ZIMHI is novel for a number of reasons, as set forth below.

30. In March 2019, ZIMHI's New Drug Application ("NDA") was submitted to the FDA, with an Amendment thereto subsequently submitted in June 2019.

31. In November 2019, the United States Food and Drug Administration (the "FDA") provided a Complete Response Letter ("CRL") to Adamis Pharma regarding the ZIMHI NDA.

32. In May 2020, in response to FDA's CRL, Adamis Pharma resubmitted a new NDA for ZIMHI.

33. Subsequently, in November 2020, the FDA provided another CRL to Adamis Pharma regarding the ZIMHI NDA.

34. In May 2021, Adamis Pharma resubmitted its ZIMHI NDA to the FDA.

35. In October 2021, the FDA approved the ZIMHI NDA.

36. ZIMHI has several key differentiating qualities from other devices that make it a desirable treatment for known or suspected opioid overdose and fentanyl poisonings. <u>First</u>, ZIMHI's delivery system is a safe, small, transportable and simple device that allows for intramuscular injection of naloxone by non-medical emergency staff in a community setting wherever an overdose may be encountered. <u>Second</u>, ZIMHI's delivery method may be significantly more efficacious in treatment of overdoses of fentanyl, which is becoming a more prevalent additive to opioids found on the street and also is being "spiked" into many illegal drugs, including marijuana. While naloxone is available via other FDA-approved delivery devices, the efficacy of these devices in using an intranasal route of administration in the context of a fentanyl poisoning (many opioid overdoses are in reality fentanyl poisonings) appears inferior to ZIMHI. As the prevalence of fentanyl increases and worsens the already rampant opioid epidemic, ZIMHI could be instrumental in saving lives that would otherwise have been lost under current standard of care treatments. Based upon the pharmacokinetic data in the FDA-approved package inserts, and the interim results of a formal head-to-head study comparing efficacy of the current standard of care (*i.e.*, naloxone 4 mg intranasal) against ZIMHI after dosing within context of fentanyl to induce respiratory depression, ZIMHI is superior to the current standard of care.

37. In short, opioid use has only increased since May 2020; opioid deaths have continued rising since 2020, specifically due to fentanyl poisonings. As the only injectable

naloxone product on the market, ZIMHI was uniquely positioned to address the opioid epidemic has only expanded each year since 2020.

38. On May 11, 2020—approximately 18 months before the FDA ultimately approved the ZIMHI NDA—Plaintiff Adamis Pharma and Defendant USWM executed a Distribution and Commercialization Agreement (the "Agreement"). A true and correct copy of the Agreement is attached as **Exhibit A**.

39. The Agreement provides that Delaware law governs all matters relating to the Agreement.

40. The Agreement concerned two (2) pharmaceutical products: (a) SYMJEPI, which was Adamis Pharma's injection product containing epinephrine ("SYMJEPI"), and (b) ZIMHI, Adamis Pharma's injection product containing naloxone in 5mg/0.5 mL, and any other strength, as approved by the FDA under NDA No. 212854 (collectively "ZIMHI"). Plaintiffs' claim herein relates to USWM's actions, inaction, and breach of contract concerning ZIMHI.

41. Plaintiffs estimated that ZIMHI should have captured approximately 6% of the overall naloxone market by 2027, thereby generating over $50 million per year in gross sales.

42. Upon information and belief, due to USWM's refusal to provide Plaintiffs with this information, in the two (2) years that USWM served as the exclusive marketing and distribution company for ZIMHI, total gross sales for ZIMHI amounted to less than $2 million with nearly all sales occurring in 2022. In 2022, USWM sold $1.4 million of ZIMHI, representing 0.3% of the market, and in 2023, USWM sold $617,180 of ZIMHI, representing only 0.1% of the market.

43. In 2022, though USWM had budgeted $7.9 million of ZIMHI gross sales, it ultimately achieved only $1.4 million in gross sales (a mere 18% of its target), falling short of its goal by $6.5 million (*i.e.,* an 82% miss).

7

44. In 2023, though USWM had budgeted $3.2 million of ZIMHI gross sales, it achieved only $617,180 in gross sales (a mere 19% of its target), falling short of its target by $2.6 million (*i.e.*, an 81% miss).

45. Year-over-year, actual sales of ZIMHI declined by 55%, despite a projected 10% increase in the naloxone market.

46. The reduction in ZIMHI sales was caused by USWM's reduction in the amount it spent on distribution and commercialization efforts in conflict with normal and customary pharmaceutical marketing practices.

47. Pursuant to the Agreement, Plaintiffs were obligated to manufacture and supply ZIMHI to USWM for purchase, distribution, and commercialization. *See* **Ex. A**.

48. Pursuant to the express terms of the Agreement, USWM agreed and was obligated to distribute and commercialize ZIMHI within the fifty (50) states of the United States of America, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the U.S. Virgin Islands and all territories and possessions of the United States of America, United States military bases and any other territories the parties mutually agreed in writing, but excluding in all cases sales of the Products to the U.S. Department of Defense for field-use-only (collectively, the "Territory"). *See* **Ex. A**, at §§ 1.63, 2.1, 4.

49. The Agreement provided that USWM would be the exclusive distributor of ZIMHI in the Territory and that USWM would have the exclusive right (even as to Plaintiffs) to market, sell, offer to sell ZIMHI within the Territory for an initial term of ten years. *See* **Ex. A**, at § 2.

50. For the entirety of this ten (10) year initial term, USWM agreed to use reasonable, diligent, and good-faith efforts to market, sell, and distribute ZIMHI throughout the Territory.

51. By virtue of the exclusivity of the Agreement with USWM, Plaintiffs agreed that they would not market, promote, sell, or intentionally solicit purchases of ZIMHI for the entirety of the Agreement's ten (10) year initial term.

52. In entering into the Agreement, USWM agreed to develop plans for the commercialization of ZIMHI that set forth a reasonable level of detail concerning the commercialization activities (as defined in the Agreement, the "Commercialization Plan"). USWM was required under the Agreement to provide this Commercialization Plans to Plaintiffs, but failed to do so. *See* **Ex. A,** at § 4.1.

53. Pursuant to the Agreement, USWM also agreed to provide monthly reports to Plaintiffs that included estimates of ZIMHI units sold and net sales for the prior month. *See* **Ex. A**, at § 6.2.4.

54. Pre-marketing for products like ZIMHI usually begins once the NDA is filed so that these pre-marketing activities can take place during the year while the FDA is reviewing the NDA file. Here, Adamis Pharma and USWM entered into the Agreement after the ZIMHI NDA had been submitted and as a result, USWM should have commenced its pre-marketing activities immediately. USWM thus had eighteen (18) months to engage in pre-marketing activities before the FDA ultimately approved ZIMHI for sale.

55. Upon information and belief, USWM conducted minimal to no pre-marketing activity with respect to ZIMHI. For example, USWM provided Plaintiffs with no plan for customer discovery to identify all potential points of marketing and sale of ZIMHI. USWM did not provide any market assessment to allow for informed allocation of sales personnel across the multiple and varied market segments for ZIMHI.

56. Upon information and belief, and despite the fact that USWM was exclusively responsible for marketing ZIMHI across the entire United States to tens of thousands of potential customers in a roughly billion-dollar yearly market, USWM assigned an unreasonably small number of employees to commercialize ZIMHI from April 2022 until December 2023, including, without limitation, Kristen Breton, Shannon Clark, and Jake Nichols (who was only a part-time employee).

57. Upon information and belief, USWM's marketing budget was woefully inadequate because Breck Jones, Jr., who was in charge of USWM's ZIMHI commercialization efforts, took the position that the marketing budget should only be a proportion of the sales revenue. Pharmaceutical industry standard, however, is to assign a higher than average budget for marketing with respect to (a) pre-market activities, and (b) post-launch years one (1) and two (2), and only reducing marketing only once sales are sustained and are forecasted to grow. In other words, USWM's budgeting for marketing of ZIMHI as required under the Agreement was precisely counter to generally accepted industry standard.

58. Upon information and belief, USWM's small sales force was marketing ZIMHI primarily to addiction clinics, which is a suboptimal market segment. Had USWM conducted the necessary pre-market customer discovery, it would have learned same. Even after USWM had learned that addiction clinics were the wrong target market for ZIMHI, it failed to take corrective action.

59. Furthermore, the small sales force that USWM had assigned to promote ZIMHI were focusing the vast majority of their marketing and sales efforts on another product, Lucemyra. Indeed, on sales calls, USWM's sales force responsible for ZIMHI marketing and sales were incentivized to sell Lucemyra, and not ZIMHI. The sales points for the two (2) products, however,

are different and as a result, USWM's marketing efforts of ZIMHI were not to the correct target market and were only secondary to the USWM sales force's principal and incentivized goal of selling Lucemyra.

60.     Upon information and belief, USWM instructed its employees who were tasked with marketing and selling ZIMHI to instead, focus their sales efforts on Lucemyra. USWM, as the exclusive distribution and commercialization agent of ZIMHI, made a deliberate decision not to use reasonable, diligent, and good-faith efforts to market, sell, and distribute ZIMHI throughout the Territory despite its contractual obligation to do so, knowing that DMK could be at risk of insolvency if ZIMHI was not a commercial success.

61.     Despite nationwide demand for the purchase of ZIMHI in a more than half billion-dollar ($500 million) annual market, USWM purchased a total of less than $4.5 million worth of ZIMHI from Plaintiffs for the entire period between April 2022 and December 2023.

62.     Furthermore, USWM refused to provide answers to questions posed to it by Plaintiffs about the commercialization efforts for ZIMHI pursuant to the Agreement. Specifically, in May 2023, DMK's Chief Executive Officer, Dr. Eboo Versi, met with Dr. Breck of USWM about the marketing efforts concerning ZIMHI. Before the meeting, Plaintiffs provided USWM with a list of questions regarding ZIMHI marketing, which are attached hereto as **Exhibit B**. USWM provided almost no information in response to these reasonable and pertinent questions, during the meeting.  As a result, following the meeting, Dr. Versi provided additional "Follow up Questions for USWM" relating to the unanswered inquiries into USWM's commercialization efforts, which are attached hereto as **Exhibit C**.  Again, USWM provided virtually no information in response.

63. Because USWM was the exclusive distributor of ZIMHI and had the exclusive right to market, sell, offer to sell ZIMHI within the Territory, and because Plaintiffs further agreed that they would not market, promote, sell, or intentionally solicit purchases of ZIMHI, Plaintiffs were effectively prevented from limiting their losses for the duration of the Agreement.

64. On December 21, 2023, Plaintiffs and USWM mutually agreed to terminate the Agreement regarding ZIMHI pursuant to Section 11.1(i).

## COUNT I:
## BREACH OF CONTRACT

65. Paragraphs 1 through 64 above are incorporated herein by reference, as if restated in their entirety.

66. USWM failed to exercise reasonable, diligent, and good-faith efforts to market, sell, and distribute ZIMHI throughout the Territory, as required by the Agreement.

67. USWM failed to provided information about their commercialization plans and efforts, as required by the Agreement.

68. As a result of USWM's breaches of contract, Plaintiffs have suffered the loss of hundreds of millions of dollars.

69. As a result of USWM's breach of contract, Plaintiffs were forced to file petitions for relief under Chapter 11 of the Bankruptcy Code, depriving them of anticipated additional sales and net profits regarding ZIMHI through the end of the ten-year term of the Agreement of hundreds of millions of additional dollars.

## COUNT II:
## OBJECTION TO CLAIM

70. Paragraphs 1 through 64 above are incorporated herein by reference, as if restated in their entirety.

71. On April 17, 2024, USWM filed a Proof of Claim in DMK's Bankruptcy estate seeking an unsecured claim in the amount of $9,040,615.37 [Claim No. 74].

72. As stated herein, USWM breached the Agreement with the Plaintiffs, damaging the Plaintiffs and their estates.

73. As a result of USWM's breaches of its Agreement, the Agreement is unenforceable by USWM against the Plaintiffs.

74. The Claim should be disallowed in whole, or in part, pursuant to 11 U.S.C. § 502(b)(1).

## COUNT III:
## EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. § 510(c)(1)

75. Paragraphs 1 through 64 above are incorporated herein by reference, as if restated in their entirety.

76. Plaintiffs assert a claim for equitable subordination of USWM's Claim pursuant to 11 U.S.C. § 510(c)(1).

77. The case law sets forth the following test for equitable subordination of a claim:

   a. the claimant has engaged in some type of inequitable conduct;

   b. such conduct has injured creditors or given an unfair advantage to the claimant; and

   c. equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code.

78. USWM engaged in inequitable conduct, which resulted in injury to the Debtors' creditors. Among other things, USWM failed to conduct appropriate pre-market activities, failed to allocate an appropriate budget, focused their small sales force on the sales of different pharmaceuticals, failed to allocate appropriate resources to the commercialization of ZIMHI, failed

to communicate appropriately with the Debtors when requested and, through their exclusive distribution agreement, held the Debtors' most valuable prospect hostage while blocking others from generating value revenue for the Debtors' creditors.

79. USWM's inequitable conduct was an important factor precipitating the Debtors' insolvency. USWM should not recover *pro rata* with other similarly situated creditors who did not commit inequitable acts that injured creditors.

80. Equitable subordination of the USWM Claim is consistent with the provisions of the Bankruptcy Code.

81. Accordingly, Plaintiffs request that the Court enter a judgment against USWM equitably subordinating its Claim to all other claims of the Debtors' creditors.

## PRAYER FOR RELIEF

82. WHEREFORE, Plaintiffs demand judgment in their favor and against USWM as follows:

(a) The entry of judgment in favor of Plaintiffs and against USWM for damages of $7.7 million for lost sales regarding ZIMHI from April 2022 through December 2023;

(b) The entry of judgment in favor of Plaintiffs and against USWM for damages of $258 million for lost expected sales and $63 million of lost net profits regarding ZIMHI from January 2024 through December 2030, which were likely to have occurred if USWM had properly performed its duties pursuant to the Agreement;

(c) DMK had a market capitalization of $85.5 million on March 31, 2022, that declined to effectively $0 as of today;

(d) Disallowance of the Claim, in whole or in part;

(e) Equitably subordinating USWM's Claim to all claims of the Debtors' creditors pursuant to 11 U.S.C. § 510(c)(1);

(f) Reasonable attorneys' fees and costs; and

(g) Such additional relief as this Court deems just.

Dated: June 3, 2024
Wilmington, Delaware

Respectfully submitted,

GELLERT SEITZ BUSENKELL & BROWN LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 425-5812
Facsimile: ( 302) 425-5814
E-mail: mbusenkell@gsbblaw.com

- and -

Lee B. Hart (*pro hac vice forthcoming*)
Adam D. Herring (*pro hac vice forthcoming*)
NELSON, MULLINS, RILEY & SCARBOROUGH LLP
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-6050
E-mail: lee.hart@nelsonmullins.com
adam.herring@nelsonmullins.com

- and -

Dylan G. Trache (*pro hac vice forthcoming*)
NELSON, MULLINS, RILEY & SCARBOROUGH LLP 101 Constitution Avenue, NW, Suite 900
Washington, D.C. 20001
Telephone: (202) 689-2800
Facsimile: (202) 689-2860
E-mail: dylan.trache@nelsonmullins.com

- and -

Rachel A. Sternlieb (*pro hac vice forthcoming*)
NELSON, MULLINS, RILEY &
SCARBOROUGH LLP
1400 Wewatta Street, Suite 500
Denver, CO 80202
Telephone: (303) 853-9900
E-mail: rachel.sternlieb@nelsonmullins.com

***Counsel to the Debtors in Possession***