**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| DMK PHARMACEUTICALS CORP *et al.*, | Case No. 24-10153 (MFW) |
| Debtors. | (Jointly Administered) |
| DMK PHARMACEUTICALS CORP *et al.*, | |
| Plaintiffs, | |
| v. | |
| USWM, LLC, | Adv. No. 24-50071 (MFW) |
| Defendant. | |

**DEFENDANT USWM, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS ADVERSARY COMPLAINT**

Dated: August 2, 2024

McCARTER & ENGLISH, LLP

Daniel M. Silver (#4758)
Kate Roggio Buck (#5140)
Benjamin A. Smyth (#5528)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, Delaware 19801
Tel.: (302) 984-6300
dsilver@mccarter.com
kbuck@mccarter.com
bsmyth@mccarter.com

*Counsel for Defendant USWM, LLC*

ME1 49314651v.1

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

    I.    USWM AGREES TO COMMERCIALIZE ZIMHI® UNDER A DETAILED
           AGREEMENT ESTABLISHING THE PARTIES' RIGHTS AND
           OBLIGATIONS..............................................................................................3

    II.   THE COMPLAINT ALLEGES THAT USWM IS TO BLAME FOR ZIMHI®'S
           POOR PERFORMANCE. .............................................................................6

STANDARD OF REVIEW ....................................................................................................7

ARGUMENT ..........................................................................................................................7

    I.    The Court Should Dismiss Counts I, II, AND III. ...............................................7

         A.    Count I Does Not Allege An Actionable Breach.......................................7

              1.    The Commercialization Claim Fails. .................................................8

              2.    The Information Claim Fails..............................................................11

         B.    Count II Is Not An Actionable Claim Under 11 U.S.C. § 502(b)(1). ........12

         C.    Count III Is Not An Actionable Equitable Subordination Claim...............12

    II.   PLAINTIFFS' CLAIMED DAMAGES ARE BARRED BY THE AGREEMENT
           OR UNRECOVERABLE. ....................................................................................15

CONCLUSION.......................................................................................................................18

ME1 49314651v.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 80 Nassau Assocs.*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994) ..................................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................7, 11

*Bailey v. Tektronix, Inc.*,
2024 WL 748521 (D. Del. Feb. 23, 2024) .......................................................15, 16

*Bench Walk Lighting LLC v. LG Innotek Co.*,
530 F. Supp. 3d 468 (D. Del. 2021) ..................................................................15

*Berg v. C&H Fin. Servs., Inc.*,
2024 WL 1255504 (D. Del. Mar. 25, 2024) ......................................................8, 11

*Brown v. SAP Am., Inc.*,
1999 WL 803888 (D. Del. Sept. 13, 1999) ...........................................................17

*Buchwald Cap. Advisors LLC v. Schoen (In re OPP Liquidating Co.)*,
2022 WL 774063 (Bankr. D. Del. Mar. 14, 2022) ....................................................7

*Coppedge v. U.S. Bank Nat'l Assoc.*,
2014 WL 3828384 (D. Del. July 30, 2014) ..........................................................11

*Crispo v. Musk*,
304 A.3d 567 (Del. Ch. 2023) .......................................................................16

*Duncan v. Theratx, Inc.*,
775 A.2d 1019 (Del. 2001) ..........................................................................16

*eCommerce Indus., Inc. v. MWA Intel., Inc.*,
2013 WL 5621678 (Del. Ch. Sept. 30, 2013) .......................................................17

*FinancialApps, LLC v. Envestnet, Inc.*,
2020 WL 4569466 (D. Del. July 30, 2020) ......................................................8, 11

*Hurd v. Del. State Univ.*,
2008 WL 248406 (D. Del. Jan. 28, 2008) ...........................................................15

ME1 49314651v.1

*Hydrogen Master Rts., Ltd. v. Weston*,
   228 F. Supp. 3d 320 (D. Del. 2017) (dismissing Delaware contract claim
   because "[n]o part of the complaint . . . allege[d] any facts plausibly showing
   damages to HMR from the Michigan disclosures" and "the complaint
   allege[d] in conclusory fashion that 'HMR has been damaged'")..........................................12

*J-Squared Techs., Inc v. Motorola, Inc.*,
   364 F. Supp. 2d 449 (D. Del. 2005)........................................................................17

*JJCK, LLC v. Project Lifesaver Int'l*,
   2011 WL 2610371 (D. Del. July 1, 2011) ...............................................................17

*Joseph v. Frank (In re Troll Commc'ns, LLC)*,
   385 B.R. 110 (Bankr. D. Del. 2008) ........................................................................15

*Nichols v. Bennett Detective & Protective Agency, Inc*,
   245 Fed.Appx. 224 (3d Cir. 2007)...........................................................................12

*Off. Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re
   Champion Enters., Inc.)*,
   2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010) ..................................................14

*Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs
   Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
   405 B.R. 527 (Bankr. D. Del. 2009) ..............................................................13, 14

*Owens v. Connections Cmty. Support Programs, Inc.*,
   840 F. Supp. 2d 791 (D. Del. 2012).......................................................................15

*Phunware, Inc. v. Excelmind Grp.*,
   117 F. Supp. 3d 613 (D. Del. 2015) (dismissing Delaware contract claim and
   explaining that "[t]he court may grant a motion to dismiss when unambiguous
   language of a contract contradicts plaintiffs' allegations in a complaint") ............................10

*Reklam v. Bellator Sport Worldwide LLC*,
   2017 WL 5172397 (D. Del. Nov. 8, 2017) .............................................................15

*Saunders v. E.I. DuPont De Nemours & Co.*,
   2014 WL 7051078 (D. Del. Dec. 12, 2014).............................................................15

*Tendyne Holdings, Inc. v. Abbott Vascular, Inc.*,
   2019 WL 2717857 (D. Del. June 28, 2019)........................................................8, 9, 11

*Tilton v. MBIA Inc. (In re Zohar III, Corp.)*,
   639 B.R. 73 (Bankr. D. Del. 2022) ..................................................................12, 13

*Washington Mut., Inc. v. XL Specialty Ins. (In re Washington Mut., Inc.)*,
   2012 WL 4755209 (Bankr. D. Del. Oct. 4, 2012) .............................................14, 15

*WhitServe LLC v. Donuts Inc.*,
    390 F. Supp. 3d 571 (D. Del. 2019)........................................................................7

**Statutes**

11 U.S.C. § 502(b)(1) ..................................................................................1, 12

11 U.S.C. § 510(c) ....................................................................................2, 14, 15

11 U.S.C. § 510(c)(1).........................................................................................1

**Other Authorities**

Bankruptcy Rule 7012(b)..................................................................................7

Federal Rules of Civil Procedure 8, 9, and 12(b)(6)........................................7

Rule 12(b)(6) ...................................................................................................7

ME1 49314651v.1

## INTRODUCTION

Defendant USWM, LLC ("**USWM**") respectfully moves to dismiss the complaint that Plaintiffs DMK Pharmaceuticals Corporation ("**DMK**") and Adamis Pharmaceuticals Corporation ("**Adamis**," and together with DMK, "**Plaintiffs**") filed in this adversary proceeding ("**Complaint**"). (D.I. 1). As explained below, the Complaint lacks sufficient factual information to state plausible claims for relief. And even if their claims were to survive, Plaintiffs seek substantially exaggerated damages contrary to the controlling contract.

That contract is a 2020 Distribution and Commercialization Agreement between Adamis and USWM ("**Agreement**").[1] In the Agreement, Adamis appointed USWM to distribute ZIMHI®, "an injectable naloxone product approved by the Food and Drug Administration for treatment of opioid emergencies." (Complaint, ¶ 1). While USWM had "final discretion" over commercialization decisions like pricing and marketing, it agreed to use "Commercially Reasonable Efforts"—as that term is defined in the Agreement ("**CRE**")—in commercializing ZIMHI®.

In early 2024, Plaintiffs filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. After USWM filed a timely proof of claim ("**Bankruptcy Claim**"), Plaintiffs sued USWM seeking over $414 million in damages, to erase the Bankruptcy Claim under 11 U.S.C. § 502(b)(1), and equitable subordination under 11 U.S.C. § 510(c)(1). The Complaint is a transparent (and baseless) attempt by Plaintiffs (and their former management) to shift their failures to USWM. But no matter their motivations, Plaintiffs' claims—and their request for an astronomical damages award—fail.

---

[1] According to Plaintiffs, Adamis merged with a third party after signing the Agreement, and DMK is the entity that emerged from that transaction. (*See* Complaint, ¶ 10).

ME1 49314651v.1

In Count I, Plaintiffs allege that USWM breached the Agreement by not using "commercially reasonable efforts"[2] ("**Commercialization Claim**"). This claim has at least three faults. <u>First</u>, the Complaint does not allege any Agreement provision(s) that USWM breached and thus does not plead required elements – an enforceable contractual obligation that USWM breached. <u>Second</u>, the Agreement defines CRE as "reasonable, diligent, good-faith efforts . . . as [USWM] would <u>normally use</u> to accomplish a similar objective <u>under similar circumstances</u> exercising reasonable business judgment" (emphasis added), but the Complaint is silent about what USWM normally does in commercializing products under similar circumstances. <u>Third</u>, the Agreement states that "USWM shall <u>not</u> be deemed to be in breach of its Commercial Efforts obligations" (emphasis added) if it spends enough to substantially match the "Sales and Distribution Allocation," but the Complaint says nothing about that allocation or what USWM spent. For all these reasons, the Complaint lacks sufficient factual information to state a plausible Commercialization Claim.[3]

In Count II, Plaintiffs seek to negate USWM's Bankruptcy Claim based on the breaches alleged in Count I. As Plaintiffs have not alleged any plausible breach in Count I, Count II must also be dismissed.

In Count III, Plaintiffs allege equitable subordination. But they have not pleaded facts suggesting inequitable conduct. And as the Bankruptcy Claim has not been allowed, an equitable subordination claim is impermissible under 11 U.S.C. § 510(c). Thus, Count III should be

_____

[2] The Complaint alleges that USWM failed to use "commercially reasonable efforts" but, as detailed below, ignores the Agreement's CRE standard. Thus, "CRE" is used to reference the Agreement's standard and is distinct from the term "commercially reasonable efforts," which refers to, among other things, allegations in the Complaint.

[3] Count I also alleges that USWM breached the Agreement by withholding unspecified information ("**Information Claim**"). The Court should dismiss this claim because it is premised solely on conclusory allegations and not supported by any well-pleaded facts.

dismissed.

Finally, most of the damages Plaintiffs seek are barred by, or unrecoverable under, the Agreement. Thus, if any substantive claims survive, USWM respectfully requests that the Court dismiss claims for damages that cannot be recovered.[4]

## FACTUAL BACKGROUND[5]

USWM is a specialty pharmaceutical company that develops, licenses, and brings to market unique healthcare products to help patients with challenging conditions and unmet medical needs.

Adamis was a biopharmaceutical company. After entering the Agreement, Adamis merged with another company, and DMK was the resulting entity. (Complaint, ¶ 10).

## I.    USWM AGREES TO COMMERCIALIZE ZIMHI® UNDER A DETAILED AGREEMENT ESTABLISHING THE PARTIES' RIGHTS AND OBLIGATIONS.

Adamis and USWM entered the Agreement to commercialize two products: SYMJEPI® and ZIMHI®. (*Id.* ¶ 40). SYMJEPI® was Adamis's "injection product containing epinephrine." (*Id.*). ZIMHI® was Adamis's "injection product containing naloxone in 5mg/0.5 mL, and any other strength, as approved by the FDA under NDA No. 212854." (*Id.*). The claims in the Complaint relate only to ZIMHI®. (*Id.*).

Under the Agreement[6]—which is governed by Delaware law (Agreement, § 12.6)—Adamis gave "USWM the exclusive right . . . to market, sell, offer for sale, and otherwise

---

[4] USWM disputes that Plaintiffs are entitled to any recovery. But the misperception by Plaintiffs and the creditors who stand to benefit from any recovery that this case is worth hundreds of millions of dollars cannot stand.

[5] Solely for its motion to dismiss, USWM has accepted and relied on the Complaint's allegations. Even so, USWM disputes many allegations in the Complaint.

[6] The Agreement is Exhibit A.

Commercialize" ZIMHI® in the United States and its territories and military bases for at least 10 years. (*Id*. § 2.1; *see also id*. §§ 1.64, 11.1).

USWM agreed to "use Commercially Reasonable Efforts, including Commercial Efforts" in commercializing ZIMHI®. (*Id*. § 4.1). Section 1.18 of the Agreement defines CRE by referencing what USWM would "normally" do under "similar circumstances":

> "Commercially Reasonable Efforts" means, with respect to the efforts to be expended by a Party with respect to any objective under this Agreement, <u>reasonable, diligent, good-faith efforts to accomplish such objective as such Party would normally use to accomplish a similar objective under similar circumstances exercising reasonable business judgment</u>. It is anticipated that the level of effort may change over time, reflecting changes in the status of such Party and its circumstances, including, without limitation, the market for the Products. "Commercially Reasonable" shall have the correlative meaning.

(Emphasis added).

The Agreement gave USWM "final discretion in determining the pricing, terms of sale, marketing, and selling decisions" for ZIMHI®. (*Id*. § 4.4). But the parties also agreed to form a "Joint Project Team" ("**JPT**"), a six-member group with three representatives from each of Adamis and USWM that was intended to be a forum for discussing, among other things, planned "Commercial Efforts." (*Id*. § 4.2.1).

The JPT controlled commercialization costs via the "Sales and Distribution Allocation" (*see id*. § 4.2.2), a "Commercial Efforts" component. (*See id*., Schedule F). The Sales and Distribution Allocation covered "all actual direct Commercialization costs and expenses incurred by USWM . . . ." (*Id*., Schedule F).

The Sales and Distribution Allocation also created a "safe harbor" for USWM. The parties agreed that USWM <u>cannot</u> be "deemed" to have breached commercialization obligations if it substantially complied with the Sales and Distribution Allocation:

4

Notwithstanding anything in this Agreement to the contrary, <u>USWM shall not be deemed to be in breach of its Commercial Efforts obligations under this Agreement</u> so long as USWM actually expends direct costs via the Sales and Distribution Allocation in an amount within twenty percent (20%) (e.g., either greater than or less than) of the allocation for the Sales and Distribution Allocation previously determined and agreed by the JPT.

(*Id*., Schedule F (emphasis added) ("**Safe Harbor**")).

The Agreement was potentially lucrative for both sides. The parties agreed to share "Net Profits." (*Id*. §§ 6.2.1, 6.2.3; *id*., Schedule B). With one exception (*see id*. § 6.2.3),[7] the Agreement allocated the first $4 million in Net Profits to Adamis, and the parties shared Net Profits above that amount evenly. (*See id*. §§ 6.2.1, 6.2.3; *id*., Schedule B).

The Agreement also provided Adamis with the chance to earn milestone payments based on SYMJEPI® sales, or, in some cases, SYMJEPI® *and* ZIMHI® sales. (*Id*. § 6.1; *id*., Schedule C). The maximum amount Plaintiffs could earn in milestones from ZIMHI® sales was $20 million. (*Id*., Schedule C).

While Adamis and USWM stood to benefit if ZIMHI® succeeded, Adamis acknowledged that USWM was not guaranteeing success or sales:

Notwithstanding USWM's obligations to meet the Commercial Efforts set by the JPT, Company acknowledges that USWM makes no further representation, warranty or covenant, either express or implied, that (a) USWM will succeed in Commercializing the Products in the Territory, (b) the Products will achieve any particular sales level, or (c) achievement of any Commercialization Plan guarantees the achievement of any particular future sales level within any given period of time, if at all.

(*Id*. § 6.6).

---

[7] The first $4 million in Net Profits went to Plaintiffs only if there was no "Competitive Entry" (Agreement, § 6.2.3; *id*., Schedule B), which the Agreement defines as "an event in which prior to" Adamis "receiving Regulatory Approval, another drug-device combination product obtains regulatory clearance to begin marketing that claims to deliver a naloxone dose significantly greater than the currently available 2mg intramuscular or 4mg intranasal administration, that could also be reasonably expected to compete favorably against the Product in the Territory." (*Id*. § 1.20).

ME1 49314651v.1

Finally, knowing the risks in product commercialization, the parties agreed to limit liability for potential damages. Among other things, Section 8.6 provides that neither party can be liable for consequential damages:

> TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY OR ANY OTHER PERSON FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT EXCEPT TO THE EXTENT THAT A PARTY IS SOLELY SEEKING REIMBURSEMENT FOR SUCH DAMAGES PAID TO A THIRD PARTY AND SUCH REIMBURSEMENT IS COVERED BY THE INDEMNIFICATION PROVISIONS OF THIS AGREEMENT; AND PROVIDED THAT THIS SECTION 8.6 SHALL NOT BE CONSTRUED TO LIMIT A PARTY'S RIGHT TO SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES FOR THE OTHER PARTY'S BREACH OF SECTION 10.[8]

(Emphasis added).

## II.    THE COMPLAINT ALLEGES THAT USWM IS TO BLAME FOR ZIMHI®'S POOR PERFORMANCE.

ZIMHI® performed worse than Adamis had hoped. (Complaint, ¶¶ 41-44). Sales declined year-after-year. (*Id*. ¶¶ 45-46). Eventually, Plaintiffs filed the Complaint and blamed their failings on USWM. Plaintiffs allege that "USWM breached the contract with Plaintiffs by failing to use commercially reasonable efforts to commercialize ZIMHI, which resulted in substantial damages to Plaintiffs, ultimately requiring Plaintiffs to file the instant Chapter 11 matter." (*Id*. ¶ 1). They also allege that "USWM failed to provided [sic] information about their [sic] commercialization plans and efforts, as required by the Agreement." (*Id*. ¶ 67).

---

[8] Plaintiffs have not alleged that USWM breached Section 10, the Agreement's confidentiality provision.

ME1 49314651v.1

## STANDARD OF REVIEW[9]

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads <u>factual content</u> that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added).

"The Court's review is limited to the allegations in the complaint, exhibits attached to the complaint, and documents incorporated by reference." *WhitServe LLC v. Donuts Inc.*, 390 F. Supp. 3d 571, 575 (D. Del. 2019). "In assessing the plausibility of a claim, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Id.* But "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Id.* at 686.

## ARGUMENT

I.    **THE COURT SHOULD DISMISS COUNTS I, II, AND III.**

A.    **Count I Does Not Allege An Actionable Breach.**

Count I is a contract claim with two breach theories: the Commercialization Claim and the Information Claim. Thus, Plaintiffs "must [have] alleged facts sufficient" for the Court to "plausibly infer: (1) the existence of a contractual obligation; (2) a breach of that obligation by the

---

[9] As Federal Rules of Civil Procedure 8, 9, and 12(b)(6) are "incorporated by the Federal Rules of Bankruptcy Procedure," including Bankruptcy Rule 7012(b), "citations herein are to the Federal Rules of Civil Procedure." *Buchwald Cap. Advisors LLC v. Schoen (In re OPP Liquidating Co.)*, 2022 WL 774063, at *2 n.12 (Bankr. D. Del. Mar. 14, 2022).

defendant; and (3) resulting damage to the plaintiff." *Tendyne Holdings, Inc. v. Abbott Vascular, Inc.*, 2019 WL 2717857, at *2 (D. Del. June 28, 2019) (providing elements for contract claims under Delaware law). For both theories, Count I fails this test.

### 1.    *The Commercialization Claim Fails.*

Plaintiffs allege that USWM breached the Agreement "by failing to use commercially reasonable efforts to commercialize ZIMHI." (Complaint, ¶ 1). But the Complaint does not identify what Agreement provision(s) USWM allegedly breached. Thus, the Court cannot assess the first two contract claim elements – the existence and breach of a contractual obligation. On that basis alone, the Court should dismiss the Commercialization Claim. *See FinancialApps, LLC v. Envestnet, Inc.*, 2020 WL 4569466, at *3 (D. Del. July 30, 2020) ("Courts applying Delaware law to breach of contract claims have dismissed claims that fail to identify the express contract provision that was breached, and why such a provision was breached."); *Berg v. C&H Fin. Servs., Inc.*, 2024 WL 1255504, at *3 (D. Del. Mar. 25, 2024) (dismissing contract claim because amended complaint did "not identify any provision of the Operating Agreement (or any other contract) that [defendant was] alleged to have breached").

Even if Plaintiffs had identified a provision, Count I fails because the Complaint completely neglects material parts of Agreement, including Section 1.18, which defines CRE, and the Safe Harbor, which bars the Commercialization Claim if USWM substantially complied with the Sales and Distribution Allocation.

Starting with Section 1.18, courts dismiss claims premised on allegedly deficient "commercially reasonable efforts" that do not engage with how that term is defined. For example, in *Tendyne* now-Chief Judge Connolly granted a motion to dismiss, in part, because the complaint "fail[ed] to address the Agreement's definition of Commercially Reasonable Efforts" and did "not

allege any facts from which the Court [could] plausibly infer that [the defendant had] violated this standard." 2019 WL 2717857, at *2, 3.

In this case, Section 1.18 defines CRE as "reasonable, diligent, good-faith efforts . . . as [USWM] would <u>normally use</u> to accomplish a similar objective under <u>similar circumstances</u> exercising reasonable business judgment." (Emphasis added). The Complaint neglects the underlined language in the preceding sentence, which is critical to the CRE standard. Thus, just as in *Tendyne*, dismissal is required.

For example, rather than addressing the CRE standard in Section 1.18, Plaintiffs allege that reduced ZIMHI® sales were "caused by USWM's reduction in the amount it spent on distribution and commercialization efforts in conflict with normal and customary pharmaceutical marketing practices." (Complaint, ¶¶ 45-46). But "normal and customary pharmaceutical marketing practices" are irrelevant to Section 1.18, which turns on what USWM "normally" does "under similar circumstances" and says nothing about industry custom, practices, or the like. The Complaint alleges no facts that could support a viable claim that USWM breached the CRE standard, such as USWM's normal spend on distribution and commercialization generally, much less products like ZIMHI®. Such facts are necessary to satisfy the "similar circumstances" language in Section 1.18, and the Court cannot plausibly infer that the allegations above differ from what USWM "normally" does under "similar circumstances" or that USWM has breached the Agreement.

This defect plagues all the Complaint's "commercially reasonable efforts" allegations, not just the example above. Indeed, the Complaint alleges zero facts about what USWM "normally" does under any circumstances. Thus, the Commercialization Claim must be dismissed because there is no plausible claim that USWM breached any CRE obligation.

Even if Plaintiffs had grappled with Section 1.18, the Commercialization Claim also fails because it ignores the Agreement's Safe Harbor, which provides that "<u>USWM **shall not** be deemed to be in breach of its Commercial Efforts obligations</u>" if it "actually expends direct costs via the Sales and Distribution Allocation in an amount within twenty percent . . . of the allocation for the Sales and Distribution Allocation previously determined and agreed by the JPT." (Agreement, Schedule F (emphasis added)).

Here again, Plaintiffs allege nothing about USWM's commercialization costs or the Sale and Distribution Allocation. Thus, the Complaint lacks well-pleaded allegations sufficient to avoid the Safe Harbor. Indeed, because Plaintiffs have alleged nothing suggesting that USWM failed to spend within 20% of the Sale and Distribution Allocation, it cannot plausibly be inferred that USWM has breached "its Commercial Efforts obligations." *See*, *e.g.*, *Phunware, Inc. v. Excelmind Grp.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015) (dismissing Delaware contract claim and explaining that "[t]he court may grant a motion to dismiss when unambiguous language of a contract contradicts plaintiffs' allegations in a complaint").

While the Complaint's silence on Section 1.18 and the Safe Harbor is dispositive, the Commercialization Claim has other defects. For instance, Plaintiffs complain about low and decreasing sales (Complaint, ¶¶ 41-44), but USWM had no duty to achieve or maintain any  sales thresholds. Adamis "acknowledge[d]" that USWM had made "no further representation, warranty or covenant . . . that . . . the Products will achieve any particular sales level . . . ." (Agreement, § 6.6). As USWM did not guaranty "any particular sales," it had no contractual obligation to achieve any sales. Thus, allegations about declining sales, sales that did not hit Plaintiffs' arbitrary expectations, and so forth cannot state a plausible claim that USWM breached the Agreement.

ME1 49314651v.1

Plaintiffs also allege that USWM "market[ed] ZIMHI to addiction clinics, which is a suboptimal market segment . . . ." (Complaint, ¶ 58). This is a conclusory allegation that the Court need <u>not</u> credit. *See Coppedge v. U.S. Bank Nat'l Assoc.*, 2014 WL 3828384, at *2 (D. Del. July 30, 2014) ("'The Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context,' however, so conclusory factual statements may be struck from consideration.") (quoting *Iqbal*, 556 U.S. at 686).

For all these reasons, the Commercialization Claim fails and must be dismissed.

### 2.    *The Information Claim Fails.*

Plaintiffs allege that USWM withheld sales information (Complaint, ¶ 42), "refused to provide answers to questions . . . about the commercialization efforts" (*id.* ¶ 62), and "failed to provided [sic] information about their [sic] commercialization plans and efforts . . . ." (*Id.* ¶¶ 42, 62, 67). But they have not said what "information" USWM supposedly withheld or, with one exception discussed below, what provision(s) USWM allegedly breached. Thus, dismissal is required. *See Iqbal*, 556 U.S. 662 at 678 (a complaint is not sufficient "if it tenders naked assertions devoid of further factual enhancement") (cleaned up); *FinancialApps*, 2020 WL 4569466, at *3 ("Courts applying Delaware law to breach of contract claims have dismissed claims that fail to identify the express contract provision that was breached, and why such a provision was breached."); *Berg*, 2024 WL 1255504, at *3 (dismissing contract claim because amended complaint did "not identify any provision of the Operating Agreement (or any other contract) that [defendant was] alleged to have breached").

Citing Section 4.1, the Complaint alleges that "USWM was required under the Agreement to provide this Commercialization Plans [sic] to Plaintiffs, but failed to do so." (Complaint, ¶ 52). This is a conclusory allegation that the Court should disregard. *See*, *e.g.*, *Tendyne*, 2019 WL 2717857, at *3 ("Plaintiff also alleges that 'Abbott further breached the Agreement by failing to

provide sufficient reports of the Earn-out Device's progress to the Committee.' But Plaintiff does not allege any facts from which the Court can plausibly infer that Abbott failed to provide sufficient progress reports. Plaintiff's conclusory legal assertion is not entitled to the assumption of truth.") (cleaned up).

Along with alleging no facts to support a liability inference, Plaintiffs have failed to allege plausible damages for the Information Claim. The Complaint baldly asserts that unspecified "breaches" have caused damages. (Complaint, ¶¶ 68-60). But there are no well-pleaded facts linking those alleged damages with supposedly withheld information. The Information Claim fails for this reason alone. *See*, *e.g.*, *Nichols v. Bennett Detective & Protective Agency, Inc*, 245 Fed.Appx. 224, 231 (3d Cir. 2007) (affirming dismissal because plaintiff failed to support conclusory damages allegations with facts); *Hydrogen Master Rts., Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017) (dismissing Delaware contract claim because "[n]o part of the complaint . . . allege[d] any facts plausibly showing damages to HMR from the Michigan disclosures" and "the complaint allege[d] in conclusory fashion that 'HMR has been damaged'").

For all these reasons, the Information Claim fails and must be dismissed.

### B.    Count II Is Not An Actionable Claim Under 11 U.S.C. § 502(b)(1).

In Count II, Plaintiffs seek to disallow USWM's Bankruptcy Claim under 11 U.S.C. § 502(b)(1) based on the contract breaches alleged in Count I. (Complaint, ¶¶ 70-74). Because Count II derives from Count I, the former must be dismissed with the latter.

### C.    Count III Is Not An Actionable Equitable Subordination Claim.

Count III seeks equitable subordination, which "is a drastic and unusual remedy that should only be applied in limited circumstances." *Tilton v. MBIA Inc. (In re Zohar III, Corp.)*, 639 B.R. 73, 90, 117 (Bankr. D. Del. 2022) (cleaned up) (dismissing equitable subordination claims "without leave to amend"). "The appropriate exercise of such power occurs when three conditions

12

are satisfied:" (1) "the claimant must have engaged in some type of inequitable conduct;" (2) "the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;" and (3) "equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Id.* at 90 (cleaned up).

For the first element, "[c]ourts generally recognize three categories of misconduct that constitute inequitable conduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Id.* at 90-91. These "categories are not exclusive," but "[t]he most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act." *Id.* at 91 (cleaned up). "This is because the degree of inequitable conduct sufficient to justify the application of equitable subordination is dependent on the creditor's status at the time of the act." *Id.*

If a creditor is an outsider, then "the circumstances supporting an equitable subordination claim are few and far between." *Id.* (cleaned up). "The law is well-settled that where, as here, the defendant is not an insider or fiduciary of the company, 'the party seeking to apply equitable subordination bears a <u>higher burden of proof</u> in which he or she <u>must show that the respondent engaged in egregious conduct such as fraud, spoliation or overreaching</u>.'" *Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) (emphasis added) (quoting *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Cap. Corp.)*, 307 B.R. 767 (D. Del. 2004)). "Moreover, these facts <u>must be pled with particularity</u>." *Id.* (emphasis added).

13

USWM was not an insider and Plaintiffs do not allege that it was. Thus, the higher "outsider burden" applies. But the Complaint does not allege—with particularity or otherwise—"egregious conduct" like fraud, spoliation, or overreaching. Thus, Count III fails. *See*, *e.g.*, *id.* (dismissing equitable subordination claim because complaint did not allege that lenders "controlled" debtor or were insiders or fiduciaries, and there were no facts, pleaded with particularity or otherwise, to suggest "egregious conduct such as fraud, spoliation or overreaching").

Rather than the "egregious conduct" that equitable subordination requires, Count III is based on the failed breach allegations discussed in connection with Count I. As Plaintiffs have not alleged a plausible breach, Count III fails. But even if Plaintiffs had plausible contract claims, a garden variety breach of contract is not enough to support an equitable subordination claim against an outsider like USWM. *See*, *e.g.*, *Off. Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters., Inc.)*, 2010 WL 3522132, at *13 (Bankr. D. Del. Sept. 1, 2010) (dismissing equitable subordination claim because "regardless whether Credit Suisse breached the Credit Agreement, the conduct does not rise to the level of inequitable behavior necessary for equitable subordination"). *See also In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) (granting motion to dismiss and explaining that, absent "fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity," an equitable subordination claim against a "non-insider . . . [i]n commercial cases" requires "a substantial breach of contract and advantage-taking by the creditor") (emphasis added).

The equitable subordination claim also runs head first into 11 U.S.C. § 510(c), which "permits equitable subordination of 'all or part of an allowed claim or all or part of an allowed interest." *Washington Mut., Inc. v. XL Specialty Ins. (In re Washington Mut., Inc.)*, 2012 WL 4755209, at *6 (Bankr. D. Del. Oct. 4, 2012). "The great weight of authority is that Section 510(c)

14

does not permit subordination absent an allowed claim." *Id*. (emphasis added) (quotations omitted). Thus, in addition to the reasons already discussed, Count III cannot survive because the Bankruptcy Claim has not been allowed. *See*, *e.g.*, *id*. (dismissing equitable subordination claim because "Defendants have not even filed proofs of claim in this case, nor have those claims been allowed").

For all these reasons, Count III fails and must be dismissed.

## II.    PLAINTIFFS' CLAIMED DAMAGES ARE BARRED BY THE AGREEMENT OR UNRECOVERABLE.

For argument's sake, even if one or more claims survive, damages Plaintiffs seek must be dismissed. Courts will dismiss or limit damages that are not plausibly recoverable at the pleading stage. [10] For the $414.2 million that Plaintiffs seek here—which includes $265.7 million in supposedly lost sales, $85.5 million in lost "market capitalization," and $63 million in lost future net profits (Complaint at 14)—most of those damages are barred by, or cannot be recovered under, the Agreement.

"The standard remedy for breach of contract under Delaware law are expectation damages." *Bailey v. Tektronix, Inc.*, 2024 WL 748521, at *8 (D. Del. Feb. 23, 2024). "Expectation damages are measured by the amount of money that would put the non-breaching party in the same position

---

[10] *See*, *e.g.*, *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468, 478, 493 (D. Del. 2021) (adopting magistrate's report and recommendation recommending dismissal of "willful infringement" patent claims seeking "'pre-suit' damages"); *Reklam v. Bellator Sport Worldwide LLC*, 2017 WL 5172397, at *7 (D. Del. Nov. 8, 2017) (recommending dismissal because there were no "factual allegations as to damages that rise to the level of plausibility"), *report and recommendation adopted* 2017 WL 5985562 (D. Del. Dec. 1, 2017); *Saunders v. E.I. DuPont De Nemours & Co.*, 2014 WL 7051078, at *5 (D. Del. Dec. 12, 2014) (dismissing claims for punitive and consequential damages); *Owens v. Connections Cmty. Support Programs, Inc.*, 840 F. Supp. 2d 791, 799-800 (D. Del. 2012) (dismissing claim for punitive damages, which were "not available" under Delaware law); *Joseph v. Frank (In re Troll Commc'ns, LLC)*, 385 B.R. 110, 122 (Bankr. D. Del. 2008) (granting motion to dismiss in part because damages theory was not viable under Delaware law); *Hurd v. Del. State Univ.*, 2008 WL 248406, at *2 (D. Del. Jan. 28, 2008) (dismissing "demand for punitive damages," which were unavailable as matter of law).

as if the breaching party had performed the contract." *Id*. Thus, recoverable contract damages hinge on "the promisee's reasonable expectation of the value of the breached contract." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (defining expectation damages under Delaware law).

Plaintiffs' "expected value" under the Agreement generally came from two sources: Net Profit distributions and sales milestones. (Agreement, §§ 6.1, 6.2.1, 6.2.3; *id*., Schedules B and C).[11] Thus, Plaintiffs' damages cannot exceed what Plaintiffs could have received in Net Profits and sales milestones under the Agreement. As the Delaware Court of Chancery has explained, "[a] party cannot recover damages for consideration that it would not expect to receive had the contract been performed." *Crispo v. Musk*, 304 A.3d 567, 583 (Del. Ch. 2023).

For sales,[12] the most Plaintiffs stood to receive under the Agreement was $20 million. (Agreement, Schedule C). Thus, Plaintiffs' claim for $265.7 million in "lost sales" damages is contrary to the Agreement. Accordingly, USWM respectfully requests that the Court dismiss Plaintiffs' claim for sales-related damages exceeding the $20 million in sales milestones. Not only is this result warranted by the Agreement and Delaware law, but Plaintiffs (and their creditors) should understand that their damages claims are vastly overstated by an order of magnitude.

Along with seeking exponentially more in lost sales damages than they can plausibly recover, Plaintiffs are seeking damages barred by Section 8.6. That provision forbids consequential

---

[11] Adamis also bargained for "Near-Term Milestone Payments" that were triggered by executing the Agreement and "Regulatory Approval" of SYMJEPI® and ZIMHI®. (*See* Agreement, § 6.1; *id*., Schedule B). Such milestones are neither at issue in the Complaint nor relevant here.

[12] With the plaintiff-friendly rules that govern pleading-stage motions, USWM is not seeking specifically to dismiss Plaintiffs' claims for lost profits. Even so, USWM is confident that Plaintiffs will not recover any lost profits, assuming any substantive claims are left after the Court rules on USWM's motion to dismiss. As discovery will show, ZIMHI® performed so poorly that there were never any "Net Profits" to distribute.

damages, which are "losses that do not flow directly and immediately from an injurious act but that result indirectly from the act." *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013) (cleaned up).[13]

For the $85.5 million in "lost market capitalization" sought in the Complaint, Plaintiffs' theory is that USWM did not use CRE, which decreased ZIMHI® sales and market share (*see* Complaint, ¶¶ 41-46), which in turn allegedly made DMK insolvent and decreased its stock value. (*See*, *e.g.*, ¶ 1 (alleging that "USWM breached the contract . . . by failing to use commercially reasonable efforts to commercialize ZIMHI, which resulted in substantial damages to Plaintiffs, ultimately requiring Plaintiffs to file the instant Chapter 11 matter."); *id.* at 14 ("DMK had a market capitalization of $85.5 million on March 31, 2022, that declined to effectively $0 as of today"); *see also id.* ¶¶ 69, 78-79). Thus, these damages do not flow directly or immediately from any alleged breach and are consequential damages barred by Section 8.6.

For all these reasons, even if one or more substantive claims survive, the Court should dismiss claims seeking (1) "lost sales" damages over $20 million and (2) "lost market capitalization" damages.

---

[13] Provisions like Section 8.6 are routinely enforced at the pleading stage. *See*, *e.g.*, *JJCK, LLC v. Project Lifesaver Int'l*, 2011 WL 2610371, at *10-11 (D. Del. July 1, 2011) (enforcing liability limitation provision in granting motion to dismiss); *J-Squared Techs., Inc v. Motorola, Inc.*, 364 F. Supp. 2d 449, 454-55 (D. Del. 2005) (same); *Brown v. SAP Am., Inc.*, 1999 WL 803888, at *10 (D. Del. Sept. 13, 1999) (same).

## <u>CONCLUSION</u>

For the reasons above, the Court should grant USWM's motion and dismiss Counts I, II and III with prejudice. Or, if any substantive claims survive, the Court should limit Plaintiffs' claims for damages consistent with the parties' Agreement.

Dated: August 2, 2024

McCARTER & ENGLISH, LLP

<u>/s/ *Daniel M. Silver*</u>
Daniel M. Silver (#4758)
Kate Roggio Buck (#5140)
Benjamin A. Smyth (#5528)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, Delaware 19801
Tel.: (302) 984-6300
dsilver@mccarter.com
kbuck@mccarter.com
bsmyth@mccarter.com

*Counsel for Defendant USWM, LLC*

ME1 49314651v.1