**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DMK PHARMACEUTICALS CORP., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10153 (MFW)<br>(Jointly Administered) |
| DMK PHARMACEUTICALS CORP, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>USWM, LLC,<br><br>Defendant. | Adv. Pro No. 24-50071 (MFW) |

**PLAINTIFFS' RESPONSE TO DEFENDANT USWM'S**
**MOTION TO DISMISS ADVERSARY COMPLAINT**

Dated: October 1, 2024
Wilmington, Delaware

GELLERT SEITZ BUSENKELL & BROWN LLC
Michael Busenkell (DE 3933)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 425-5812
Facsimile: (302) 425-5814
E-mail: mbusenkell@gsbblaw.com

-and-

Nelson Mullins Riley & Scarborough LLP
Matthew E. Brown (*admitted pro hac vice)*
One Financial Center, Suite 3500
Boston, MA 02111
Telephone: (617) 217-4619
Email: matt.brown@nelsonmullins.com

*Counsel to DMK Pharmaceuticals Corp, et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

PLAINTIFFS' RESPONSE TO DEFENDANT USWM'S MOTION TO DISMISS ADVERSARY COMPLAINT ........ i

FACTS ........ 2

STANDARD OF REVIEW ........ 5

ARGUMENT ........ 6

A. DMK Pled Sufficient Facts to State a Breach of Contract Claim ........ 7

B. DMK Claim Objection to Claim Survives ........ 11

C. USWM Prematurely Argues about Amounts and Scope of Damages ........ 11

CONCLUSION ........ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....6

*Bistrian v. Levi*,
696 F.3d 352 (3d Cir. 2012)....5

*Cilag GMBH Intnt'l. v. Hospira Woldwide, LLC*,
No. 22-589-RGA-SRF, 2022 WL 17475481 (D. Del. Dec. 6, 2022)....13

*Connelly v. Lane Constr. Corp*.,
809 F.3d 780 (3d Cir. 2016)....6

*CrewFacilities.com, LLC v. HotelEngine, Inc*.,
C.A. No. 20-1637-RGA, 2021 WL 2649758 (D. Del. June 28, 2021)....13

*eCommerce Indus., Inc. v. MWA Intelligence, Inc.*,
2013 WL 5621678 (Del. Ch. Sept. 30, 2013)....12

*Estate of Lagano v. Bergen Cty. Prosecutor's Office*,
769 F.3d 850 (3d Cir. 2014)....2

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008)....2, 6

*Schuchardt v. President of the U.S.*,
839 F.3d 336 (3d Cir. 2016)....5

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
840 A.2d 606 (Del. 2003)....7, 10

*Weston v. Pa*.,
251 F.3d 420 (3d Cir. 2001)....6

**Rules**

Fed. R. Civ. P. 8....1, 2, 5, 13

Fed. R. Civ. P. 8(a)....5

**Statutes**

11 U.S.C. § 502(b)(1) ....................................................................................................................11

To avoid the consequences of its actions and inactions, Defendant USWM, LLC ("USWM") improperly uses its motion to dismiss to argue the merits of the case while so narrowly and incorrectly construing Federal Rule of Civil Procedure 8 and the parties' Distribution and Commercialization Agreement ("the Agreement") that Plaintiffs DMK Pharmaceuticals Corp. and Adamis Pharmaceuticals Corp. (collectively "DMK") could never sufficiently plead a cause of action against USWM. Indeed, the gravamen of USWM's motion to dismiss is that DMK failed to identify the commercialization efforts that USWM uses in commercializing *other products* that DMK would have no way of knowing about pre-discovery, that DMK failed to plead the very facts that *USWM refused to provide to DMK*, and that facts available *only to USWM pre-discovery* warrant dismissal.

Contrary to USWM's position, the Third Circuit has emphasized time and again that the bar for a well-pled complaint is low. A complaint need only state enough facts, accepted as true and construed in the light most favorable to the plaintiff, to show that the plaintiff is entitled to relief. DMK's Complaint—with facts detailing USWM's obligation and failure to use reasonable, diligent, and good-faith efforts to market, sell, and distribute a drug, ZIMHI, that was uniquely positioned to help relieve and avoid the lethal effects of a historic, nationwide fentanyl epidemic, and thereby substantially damaging and ultimately bankrupting DMK—easily clears this bar.[1]

As such, DMK's Complaint satisfies Rule 8, and USWM's motion to dismiss DMK's breach of contract claim should be denied.[2]

---

[1] DMK agrees to withdraw its equitable subordination claim without prejudice as potentially prematurely asserted, and reserves the right to seek leave to amend the Complaint if and when discovery reveals facts giving rise to equitable subordination. As such, the Court should deny as moot USWM's motion as it relates to equitable subordination.

[2] To the extent the Court ultimately disagrees with DMK's position that USWM's motion should be denied, DMK invokes its right to amend the Complaint prior to dismissal. *See Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 861 (3d Cir. 2014) ("a district court considering

**FACTS**

Opioid-related overdose deaths climbed from approximately 49,000 in 2019 to over 81,000 just three years later in 2022. (Compl. (D.I. 1) ¶ 19.) FDA-approved pharmaceuticals, such as naloxone, play a critical role in addressing this public health epidemic. (*Id.* ¶ 20.) The market for naloxone in the United States is significant, amounting to approximately $430 million in 2020, $532.7 million in 2022, and is estimated to reach $1.4 billion by 2032 for a growth rate of over 10% per year for the next decade. (*Id.* ¶¶ 22-25.) DMK's ZIMHI is the only commercially available intramuscular naloxone product on the U.S. market. (*Id.* ¶ 28.) ZIMHI has numerous unique benefits over other naloxone products in the United States, including its safety for use by non-medical emergency staff and superior efficacy via intramuscular injection. (*Id.* ¶ 36.)

The Agreement between DMK and USWM made USWM the exclusive distributor of ZIMHI in the United States for 10 years. (*Id.* ¶¶ 48-49.) The Agreement even forbade DMK from marketing, selling, or offering to sell ZIMHI anywhere in the United States during this period. (*Id.* ¶¶ 49, 51.) The Agreement further required USWM to use reasonable, diligent, and good-faith efforts to market, sell, and distribute ZIMHI throughout the United States, and to develop plans for the commercialization of ZIMHI. (*Id.* ¶ ¶ 50, 52.)

Yet USWM did nothing of the sort. With reasonable commercial efforts, and given the unique benefits of ZIMHI, DMK estimated that ZIMHI should have captured approximately 6% of the overall naloxone market by 2027, generating over $50 million per year in gross sales. (*Id.* ¶ 41.) But USWM's sales of ZIMHI were infinitesimal compared to the growing market size of naloxone:

---

a 12(b)(6) dismissal must permit a curative amendment unless such an amendment would be inequitable or futile.") (internal punctuation omitted); *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) ("we have instructed that a district court must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend"); *id*. (the "court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time."); *id*. at 246 (not doing so is reversible error).

less than 0.3% of the market and less than $2 million dollars for 2022 and 2023 combined. (*Id.* ¶¶ 42-44.) And for the two-year period that USWM commercialized ZIMHI, despite the naloxone market *growing* over 10%, ZIMHI's already anemic sales *shrunk* 55% year over year. (*Id.* ¶ 45.)

ZIMHI's paltry sales were due to USWM's failure to commercialize the product:

- Pre-market usually happens during the year while FDA is reviewing the NDA file, and USWM had 18 months to engage in pre-marketing activities before FDA approved ZIMHI. (*Id.* ¶ 54.) Despite this industry standard, USWM conducted minimal to no pre-marketing activity for ZIMHI, providing no plan for customer discovery to identify all potential points of marketing and sale of ZIMHI, and conducting no market assessment to allow for informed allocation of sales personnel across the multiple and varied market segments for ZIMHI. (*Id.* ¶ 55.)

- Once the FDA approved ZIMHI for sale, USWM assigned an unreasonably small number of employees to commercialize ZIMHI from April 2022 to December 2023: two people and one part-time person were all that USWM assigned to a sales territory that encompassed the entire United States. (*Id.* ¶ 56.)

- USWM also marketed ZIMHI primarily to addiction centers, a suboptimal market segment, and even after learning about its inferior marketing, USWM failed to take corrective action. (*Id.* ¶ 58.)

- The 2.5-person sales force spent the vast majority of their marketing and sales efforts on another drug used to treat opioid addiction, Lucemyra; USWM instructed its sales team to focus its sales efforts on Lucemyra; and USWM incentivized the team to sell Lucemyra. (*Id.* ¶¶ 59-60.)

- USWM reduced its already small budget for ZIMHI after below-budget sales, in contravention to normal and customary pharmaceutical marketing practices. (*Id.* ¶ 46.)

When DMK's CEO confronted USWM about the poor sales of ZIMHI and requested basic information about USWM's commercialization efforts, USWM provided virtually no information in response to the following requests (*id.* ¶ 62):

- prelaunch business/launch plans for ZIMHI and any postlaunch adjustments (Ex. B to Compl. (D.I. 1-2));

- identification of who was responsible for marketing ZIMHI, who the field representatives were, and who the regional sales directors were (*id.*);

- the commission/incentive structures for ZIMHI and other products, such as Lucemyra, that USWM commercialized (*id.*);

- how much was spent on third-party marketing and advertising (*id.*);
- how many calls and meetings in which ZIMHI and other USWM products, such as Lucemyra, were discussed among payers, law enforcement, municipalities, or non-government organizations (i.e., the targeted customers for ZIMHI) (*id.*);
- how many signed contracts and purchase orders USWM had for ZIMHI for each quarter (*id.*);
- how the number of calls, meetings, contracts, and purchase orders compared to USWM's goals for ZIMHI (*id.*);
- the Strength, Weakness, Opportunities, Threats (SWOT) analyses for ZIMHI (Ex. C to Compl. (D.I. 1-3));
- what focus group work for ZIMHI was conducted, how many such sessions occurred, and what was learned during these sessions (*id.*);
- what adjustments to the marketing plan occurred after focus group sessions (*id.*);
- customer discovery activity, including dates, number of interactions, and findings (*id.*);
- pre-market medical affairs activity pre- and post-launch, including spending (*id.*);
- identification of the states in which USWM marketed ZIMHI (*id.*);
- identification of the attempts to overcome objections to states where USWM did not market ZIMHI (*id.*);
- identification of third parties engaged for public relations for ZIMHI or other products that USWM marketed, such as Lucemyra (*id.*);
- identification of any direct marketing activity for ZIMHI (*id.*);
- past or future marketing plans or budgets for ZIMHI (*id.*);
- medical affairs plan and who was responsible for carrying out such plan for ZIMHI (*id.*);
- the commissions/bonus structures or changes to those structures for regional directors and sales representatives for ZIMHI and Lucemyra (*id.*); and
- information about how USWM would use conferences, advertising, digital media, market research, product training, public relations, trade shows, honoraria, and communication agencies in marketing ZIMHI. (*Id.*)[3]

---

[3] As is clear from Exhibits B and C to DMK's Complaint, USWM incorrectly claims that DMK has "not said what 'information' USWM supposedly withheld." (USWM Mot. to Dismiss (D.I. 15) at 16-17.)

USWM's actions and inactions substantially damaged DMK. In 2020 and 2022, the commercial naloxone market in the United States was approximately $500 million per year. (Compl. (D.I. 1) ¶¶ 22-23.) That market will grow to approximately $1.4 billion by 2032. (*Id.* ¶ 24.) DMK estimated that ZIMHI would capture approximately 6% of the naloxone market by 2027, generating over $50 million per year in gross sales. (*Id.* ¶ 41.) Because of USWM's failure to commercialize ZIMHI in breach of the Agreement, DMK suffered hundreds of millions of dollars in damages over the ten-year term of the Agreement and caused DMK to file petitions for relief under Chapter 11 of the Bankruptcy Code. (*Id.* ¶¶ 68, 69.)

**STANDARD OF REVIEW**

The threshold for surviving a motion to dismiss is intentionally low. Federal Rule of Civil Procedure 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," and the Complaint "must be construed so as to do justice." The Third Circuit has made clear time and again that a complaint need only state facts that show that a claim is plausible. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) ("The touchstone of the pleading standard is plausibility."); *see Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) ("The plausibility standard does not impose a heightened pleading requirement, and that Federal Rule of Civil Procedure 8(a) continues to require only a 'showing' that the pleader is entitled to relief."); *accord Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (the Supreme Court in *Twombly* "emphasized throughout its opinion that it was neither demanding a heightened pleading standard of specifics nor imposing a probability requirement.").

"Even after *Twombly* and *Iqbal*, a complaint's allegations of historical fact continue to enjoy a highly favorable standard of review at the motion-to-dismiss stage of proceedings." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). The Court "must still . . . assume all remaining factual allegations to be true, construe those truths in the light most favorable to the

plaintiff, and then draw all reasonable inferences from them." *Id*. As the Supreme Court explicitly found in *Iqbal*, even factual allegations that are "unrealistic," "nonsensical," "chimerical," and "extravagantly fanciful" must still be taken as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *accord Connelly*, 809 F.3d at 789. This is so "even if it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

The Third Circuit further explained that "[s]tandards of pleading are not the same as standards of proof." *Phillips*, 515 F.3d at 246; *see Weston v. Pa*., 251 F.3d 420, 429 (3d Cir. 2001) ("Complaints need not plead law or match facts to every element of a legal theory.") (quotation and citation omitted). "It is worth reiterating that, at least for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss." *Connelly*, 809 F.3d at 788. A prima facie case "is an evidentiary standard, not a pleading requirement . . . and hence is not a proper measure of whether a complaint fails to state a claim." *Id*. at 789 (quotations and citations omitted). "Instead of requiring a prima facie case, the post-*Twombly* pleading standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." *Id*. (quotation and citation omitted).

## **ARGUMENT**

DMK pled facts demonstrating that the U.S. naloxone market is significant and quickly expanding; that ZIMHI is uniquely positioned to capture a significant share of the market; that USWM held the exclusive position of commercializing ZIMHI across the entire United States (even as to DMK); that USWM assigned only three people (one of whom was part time) to commercialize ZIMHI, targeted a suboptimal market while simultaneously instructing and incentivizing its sales personnel to prioritize sales of another opioid pharmaceutical, Lucemyra; that USWM met only a small fraction of the projected sales for 2022 and 2023 for ZIMHI; that USWM refused to convey

basic information to DMK about its commercialization efforts for ZIMHI; and that DMK suffered substantial damages as a result of USWM's failures. Taking these facts as true and drawing all reasonable inferences in the light most favorable to DMK, the Complaint more than sufficiently demonstrates that USWM breached the Agreement in failing to use reasonable, diligent, and good-faith efforts to market, sell, and distribute ZIMHI.

### A. DMK Pled Sufficient Facts to State a Breach of Contract Claim

To state a claim for breach of contract under Delaware law, a plaintiff must allege facts sufficient to enable a defendant to plausibly infer: (1) the existence of a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

DMK easily satisfies this standard. DMK identified the Agreement (Compl. (D.I. 1) ¶¶ 38; Ex. A to Compl.), USWM's commercialization obligations pursuant to the Agreement (*see, e.g., id*. ¶¶ 47, 48, 50, 52, 53), facts describing USWM's breach of those obligations (detailed *supra*), and the resulting substantial financial damages to DMK (*see, e.g., id*. ¶¶ 41, 42, 43, 44, 45, 63, 68).[4]

USWM's arguments attempting to resist this well-pled claim fail, and are based on either a selective and incomplete reading of the Complaint or attempt to argue the merits of their case prematurely at the pleading stage.

Selective and Incomplete Reading of the Complaint: USWM claims that because "Commercially Reasonable Efforts" is defined as "reasonable, diligent, good-faith efforts to accomplish such objective as such Party would normally use to accomplish a similar objective under

[4] USWM incorrectly claims that DMK failed to identify the specific contractual provisions that it breached. (USWM Mot. to Dismiss (D.I. 15), at 13.) DMK identified section 4 (Compl. (D.I. 1) ¶ 48) and 4.1 (*id.* ¶ 52) as the operable commercialization provisions that USWM breached. USWM incorrectly claims that DMK should have specifically identified section 1.18 of the Agreement, but that provision is simply the Definition of the term "Commercially Reasonable Efforts."

similar circumstances exercising reasonable business judgment," DMK's factual claims in the Complaint about USWM's actions and inactions regarding ZIMHI "are irrelevant" and that DMK "alleges zero facts" about what efforts USWM "would normally use" "under similar circumstances." (USWM Mot. (D.I. 15) at 14.)

*First*, USWM's argument ignores many of DMK's factual assertions and denies the drawing of all reasonable inferences in the light most favorable to DMK. The Court can reasonably infer that USWM failed to exercise commercially reasonable efforts for ZIMHI in, among other things described above, USWM's failure to follow "normal and customary pharmaceutical marketing practices" (Compl. ¶ 46), failure to conduct appropriate pre-market due diligence (*id*. ¶ 55), failure to employ a reasonable number of sales personnel to commercialize a significant product throughout the United States (*id.* ¶ 56), failure to follow pharmaceutical industry standard for budgeting pre-market activities and post-launch activities years one and two (*id.* ¶ 57), failure to market to the optimal market segments (*id.* ¶ 58), and missing sales goals by over 80% in 2022 and 2023 (*id*. ¶¶ 43-44) for a product with unique benefits (*id.* ¶¶ 28, 36) in a significant and growing market (*id.* ¶¶ 22-24).

*Second*, USWM's argument ignores DMK's allegations that USWM focused its sales force on marketing and selling Lucemyra, which is another prescription medication for use in opioid addiction, incentivized its sales force to sell Lucemyra and not ZIMHI, marketed Lucemyra to the correct target market (addiction centers) while marketing ZIMHI to a suboptimal market, and instructed its employees who were marketing ZIMHI to instead sell Lucemyra. (*Id.* ¶¶ 58-60.) The reasonable inference in the stark contrast between USWM's actions to commercialize Lucemyra and its actions and inactions to commercialize ZIMHI is that USWM failed to use the reasonable, diligent, good-faith efforts to commercialize ZIMHI that it would normally use (indeed did use for

Lucemyra) under similar circumstances (indeed identical circumstances in using the same sales force and a similar customer base for another drug to treat opioid addiction, Lucemyra).

*Third*, DMK pled that it specifically asked USWM for information about how it commercialized ZIMHI compared to how it commercialized other products, including specifically Lucemyra, and USWM provided virtually no information to DMK. (*Id.* ¶ 62; Exs. B and C to Compl.) USWM cannot both withhold information from DMK to avoid the discovery of its breach of contract, and now argue that DMK's breach of contract claim should be dismissed for failure to plead the very facts that USWM withheld. The reasonable inference that the Court should draw from these facts is that USWM's refusal to provide information about how it commercialized ZIMHI, including how these efforts compared to its efforts to commercialize other products, reflects USWM's failure to exercise reasonable, diligent, good-faith efforts to commercialize ZIMHI as it would normally use under similar circumstances, because otherwise USWM would have provided the requested information to DMK.

*Fourth*, the preceding three points are not separate and distinct, but must be construed as additive. Therefore, the reasonable inferences that the Court must draw from all the facts that DMK pled unquestionably demonstrate the sufficiency of DMK's breach of contract claim and the failure of USWM's argument for dismissal.[5]

Premature Arguments on the Merits: USWM claims that a "Safe Harbor" provision in the Agreement bars DMK's breach of contract claim. USWM's argument, however, ignores that pleading a breach of contract claim requires only (1) the existence of a contractual obligation; (2) a

---

[5] The Court should also note that USWM's claim that DMK failed to plead damages is likewise incorrect. DMK pled (1) the amount of sales misses for 2022 and 2023 (Compl. (D.I. 1) ¶¶ 43, 44), (2) the projected market share ZIMHI should have captured (*id.* ¶ 41) compared to how much it actually captured (*id.* ¶ 42), and (3) DMK's ultimate bankruptcy all because of USWM's breaches of contract (*id.* ¶ 69).

breach of that obligation by the defendant; and (3) resulting damage to the plaintiff, all of which DMK sufficiently pled. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)). USWM identifies no law suggesting that sufficiently pleading a breach of contract requires anything more. If USWM claims that the Safe Harbor provision applies, then it should raise the provision as an affirmative defense. Such a fact-intensive inquiry, however, is inappropriate at the motion-to-dismiss stage.

But, even if DMK was required to plead that the Safe Harbor provision does not apply, DMK met this standard taking all reasonable inferences in the light most favorable to DMK. The Safe Harbor provision, defined in Schedule F to the Agreement, provides as follows:

> Notwithstanding anything in this Agreement to the contrary, USWM shall not be deemed to be in breach of its Commercial Efforts obligations under this Agreement so long as USWM actually expends direct costs via the Sales and Distribution Allocation in an amount within twenty percent (20%) (e.g., either greater than or less than) of the allocation for the Sales and Distribution Allocation previously determined and agreed by the JPT.

(Schedule F to Agreement, attached as Exhibit A.) Given that USWM assigned only three employees (one of whom was part time) (Compl. (D.I. 1) ¶ 56) to market ZIMHI to entirety of the United States (*id.* ¶ 48), instructed its sales force to spend the vast majority of their marketing and sales efforts on Lucemyra (*id.* ¶ 59), and missed its sales targets for ZIMHI by over 80% each year (*id.* ¶¶ 42-45), a reasonable inference is that USWM failed to spend at least 80% of its allotted budget on ZIMHI where that budget included numerous and substantial items, according to Schedule F, including "general management, legal, compliance, finance regulatory, quality, medical affairs, marketing, sales and sales management, and trade and sales operations." Finally, as described *supra*, USWM refused to provide DMK with the very information it now claims that DMK should have pled in the Complaint. (Exs. B and C to Compl.)

For each of these reasons, DMK raised a well-pled breach of contract claim, and USWM's Motion to Dismiss should be denied.

**B. DMK Claim Objection to Claim Survives**

As USWM recognizes in its Motion (Mot. to Dismiss (D.I. 15), at 17), DMK's Bankruptcy Claim under 11 U.S.C. section 502(b)(1) is a derivative claim based on DMK's breach of contract claim. Thus, because DMK's well-pled breach of contract claim survives, its Objection to USWM's Proof of Claim survives.

**C. USWM Prematurely Argues about Amounts and Scope of Damages**

In its motion, USWM improperly asks the Court to reach numerous conclusions of fact, as a matter of law and without the benefit of any discovery, to apply various Near-Term Milestone Payments, Commercial Milestone Payments, Accelerated Net Profit Share, and Net Profit Share payment schedules and also determine what damages are direct and consequential to arrive at a damages calculation applicable to DMK's claim against USWM. The Court should decline this invitation for three reasons.

*First*, USWM's reading of the Agreement, payment schedules, and net profit-sharing provisions is incorrect and strains credulity. Despite a naloxone commercial market growing to $1.4 billion by 2032 and DMK's estimation that ZIMHI would capture 6% of that market (i.e., an average of $50 million in sales *per year*), USWM claims that DMK's maximum payment for the *entire ten-year term* of the Agreement was $20 million. (USWM's Mot. to Dismiss (D.I. 15), at 21 ("the most Plaintiffs stood to receive under the agreement was $20 million).) In other words, USWM claims that it stood to reap hundreds of millions of dollars in windfall profits while DMK received a maximum of $20 million over ten years (i.e., DMK would receive a maximum of $2 million per year while USWM would receive an average of $48 million per year of gross revenue). USWM's reading is simply wrong. The correct reading of the Agreement is that the Net Profit

Sharing provision of the Agreement called for a 50/50 split of profits *and* called for USWM to make multiple one-time Milestone Payments to DMK of up to $20 million, meaning that both parties stood to make hundreds of millions of dollars over the term of the Agreement if USWM performed, these profits were uncapped, and DMK stood to make tens of millions of dollars more than USWM (as expected given that DMK is the patent holder of ZIMHI). (Agreement Schedule B, attached as Exhibit B; Ex. A to Compl. (D.I. 1-1) § 6.)

*Second*, USWM claims that Section 8.6 of the Agreement bars the "exponentially more in lost sales damages than [DMK] can plausibly recover" given the limitation of liability concerning consequential damages. (USWM Mot. (D.I. 15) at 21.) Neither "lost sales" nor "lost profits" are excluded by the Agreement, however. Rather, USWM incorrectly assumes that lost sales and lost profits are consequential damages, contrary to case law and contrary to the Court's mandate to construe all facts in the Complaint and all reasonable inferences in the light most favorable to DMK. *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013) (lost profit damages are not consequential damages when "profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed"). Here, because USWM served as the exclusive commercialization partner of DMK (even to the exclusion of DMK), DMK could only profit if USWM performed under the Agreement. Thus, profits are precisely what DMK bargained for, and therefore lost profits are direct damages and are recoverable.

*Third*, the extent of damages and whether damages are direct or consequential are factual determinations that should be made after discovery. *See Cilag GMBH Intnt'l. v. Hospira Woldwide, LLC*, No. 22-589-RGA-SRF, 2022 WL 17475481, at * (D. Del. Dec. 6, 2022) (deferring, on a

motion to dismiss, a decision about whether certain damages constituted direct or consequential damages); *CrewFacilities.com, LLC v. HotelEngine, Inc*., C.A. No. 20-1637-RGA, 2021 WL 2649758, at *3 (D. Del. June 28, 2021) ("Determination of the categorization of damages is not an issue that this Court will decide during a motion to dismiss."). Because the key issue on a motion to dismiss for failure to state a claim is whether DMK satisfied the pleading requirements of Rule 8, and not the merits of elements of each claim, this Court should likewise decline to reach conclusions about damages at this stage of the case.

**CONCLUSION**

In sum, DMK far exceeded the mandates of Rule 8's requirements for a well-pled complaint. USWM's selective reading of the Complaint should be disregarded, and its invitation to wade into the merits at this stage and to reach conclusions of fact, as a matter of law, and without the benefit of a well-developed factual record, should be declined. Accordingly, USWM's motion should be denied.

Dated: October 1, 2024
Wilmington, Delaware

GELLERT SEITZ BUSENKELL & BROWN LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 425-5812
Facsimile: (302) 425-5814
E-mail: mbusenkell@gsbblaw.com

-and-

Nelson Mullins Riley & Scarborough LLP
Matthew E. Brown (*admitted pro hac vice)*
One Financial Center, Suite 3500
Boston, MA 02111
Telephone: (617) 217-4619
Email: matt.brown@nelsonmullins.com

*Counsel to DMK Pharmaceuticals Corp, et al.*