**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Ch. 11 |
| | ) | |
| DMK PHARMACEUTICALS CORP et al., | ) | |
| | ) | Case No. 24-10153 (MFW) |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| DMK PHARMACEUTICALS CORP et al., | ) | Adv. No. 24-50071 (MFW) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| USWM, LLC, | ) | Re: Adv. D.I. 1, 14, |
| | ) | 15, 18, 21, 22 |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION**</u>

Before the Court is the Motion of USWM, LLC ("USWM") to Dismiss the Debtors' Complaint.[1]  For the reasons stated below, the Court will deny the Motion.


I.   <u>FACTUAL AND PROCEDURAL BACKGROUND</u>[2]

DMK Pharmaceuticals Corp. and its affiliated subsidiaries (collectively the "Debtors") are a family of clinical stage

---

[1]   Adv. D.I. 1.  References to the docket in the adversary proceeding are to "Adv. D.I.#," while references to the docket in the main bankruptcy case are to "D.I. #."

[2]   The Court is not required to state findings of fact or conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  Instead, the facts recited are those well-pled allegations in the Complaint which must be accepted as true for the purposes of this Motion to Dismiss.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

neuro-biotechnology pharmaceutical companies that own various therapies focused on addressing the opioid epidemic.[3]  One of the Debtors' products, ZIMHI, is an injectable naloxone antidote used to treat opioid overdoses.[4]  USWM is a pharmaceutical company that develops, licenses, and brings to market various healthcare products.[5]

Pre-petition, the Debtors had entered into a Distribution and Commercialization Agreement (the "Agreement") with USWM to market and distribute ZIMHI.[6]  Under the Agreement, USWM contracted to serve as the exclusive distributor, marketer, and seller of ZIMHI for ten years.[7]  The Agreement contemplated that USWM would develop a commercialization plan for ZIMHI and use commercially reasonable efforts to execute that plan.[8]  The parties mutually agreed to terminate the Agreement on December 21, 2023.[9]

---

[3]    Adv. D.I. 4 ¶¶ 9, 14.

[4]    Adv. D.I. 1 ¶¶ 28-29.

[5]    Adv. D.I. 15 at 3.

[6]    Adv. D.I. 1 ¶ 1.

[7]    Id. ¶ 49.

[8]    Id. ¶¶ 50-51.

[9]    Id. ¶ 64.

On February 2, 2024, the Debtors filed petitions under chapter 11 of the Bankruptcy Code.[10]  On April 17, 2024, USWM filed a proof of claim against the Debtors in the amount of $9,040,615.37 for amounts allegedly due under the Agreement.[11] On June 3, 2024, the Debtors filed a Complaint against USWM asserting claims for breach of the Agreement and seeking to disallow USWM's proof of claim.[12]

On August 2, 2024, USWM filed a Motion to Dismiss the Complaint for failure to state a claim.[13]  The matter has been fully briefed[14] and is ripe for decision.

II.  <u>JURISDICTION</u>

The Bankruptcy Court has jurisdiction over all "proceedings arising under title 11 or arising in or related to a case under title 11."[15]  The filing of a proof of claim by a creditor subjects that creditor to the Bankruptcy Court's jurisdiction to

---

[10]     <u>Id.</u> ¶ 12.

[11]     <u>Id.</u> ¶ 71.

[12]     <u>Id.</u> ¶¶ 65-74.  The Complaint also included a third claim for equitable subordination of USWM's claim, if it is not disallowed. The Debtors have agreed to withdraw that claim.  Adv. D.I. 18 at 1, n. 1.

[13]     Adv. D.I. 14.

[14]     Adv. D.I. 15, 18, 21, 22.

[15]     28 U.S.C. § 157(b)(1).

adjudicate that claim and claims by the debtor against the creditor which are so interrelated to that claim as to be part of the claims adjudication process.[16]  The Court finds that the claims in the Debtors' Complaint are core claims subject to the Court's jurisdiction because they involve an objection to a claim filed against the estate and counterclaims by the Debtors which are both premised on the Agreement and require the Court to decide which party breached that Agreement.[17]

Although USWM does not consent to the entry of a final order or judgment by the Court if it is determined that the Court cannot enter a final order or judgment consistent with Article III of the United States Constitution,[18] it is not necessary for the Court to decide that issue at this time.  Even if the Court does not have constitutional authority to enter a final order, the Court does have authority to enter orders on preliminary

---

[16]    Langenkamp v. Culp, 498 U.S. 42, 44-45 (1990) (holding that a creditor who files a proof of claim subjects itself to the equitable jurisdiction of the bankruptcy court to adjudicate that claim and forfeits its right to a jury trial on a preference action which is part of the claim allowance process).

[17]    28 U.S.C. § 157(b)(2)(B) & (C), § 1334.

[18]    Adv. D.I. 14.  See Stern v. Marshall, 564 U.S. 462, 503 (2011) (holding that while bankruptcy court had statutory authority to enter final judgment on core counterclaim, it lacked constitutional authority to do so); Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 683-84 (2015) (holding that the bankruptcy court may enter a final order without offending Article III so long as the parties consent, expressly or impliedly).

matters to the extent they do not constitute a final

adjudication.[19]  That includes specifically the authority of the

Court to determine whether the complaint states a plausible claim

on which relief can be granted.[20]


III.  STANDARD OF REVIEW

    A.    Rule 12(b)(6)[21]

    Rule 12(b)(6) provides for dismissal for "failure to state a

claim upon which relief can be granted."[22]  Under Rule 12(b)(6),

---

[19]    See O'Toole v. McTaggart (In re Trinsum Grp., Inc.), 467
B.R. 734, 738 (Bankr. S.D.N.Y. 2012) (holding that "both before
and after Stern v. Marshall, it is clear that the bankruptcy
court may handle all pretrial proceedings, including the entry of
an interlocutory order dismissing fewer than all of the claims in
an adversary complaint.") (citations omitted).  See also Am.
Media Inc. v. Anderson Mgmt. Servs. (In re Anderson News, LLC),
Civ. No. 15-mc-199-LPS, 2015 WL 4966236, at *1-2 (D. Del. Aug.
19, 2015) (holding that bankruptcy court's authority to enter
final orders on non-core claims was not implicated where the
court entered an order denying summary judgment because that
order was not a final order) (citing Boyd v. King Par, LLC, No.
1:11-CV-1106, 2011 WL 5509873, at *2 (W.D. Mich. Nov. 10, 2011)
("[E]ven if there is uncertainty regarding the bankruptcy court's
ability to enter a final judgment . . . , that does not deprive
the bankruptcy court of the power to entertain all pre-trial
proceedings, including summary judgment motions.")).

[20]    See Trinsum Grp., 467 B.R. at 738 (holding that bankruptcy
court may enter interlocutory order dismissing fewer than all of
the claims in an adversary complaint).

[21]    Fed. R. Civ. P. 12(b)(6).  The applicable Federal Rules of
Civil Procedure are incorporated into the Federal Rules of
Bankruptcy Procedure.  See Fed. R. Bankr. P. 7012.  Therefore,
citations herein are to the Federal Rules of Civil Procedure.

[22]    Fed. R. Civ. P. 12(b)(6).

a complaint "does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[23]

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face."[24]  Two working principles underlie this pleading standard:

> First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements.  Second, determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense.[25]

Under this standard, a complaint must nudge claims "across the line from conceivable to plausible."[26]  The court must draw all reasonable inferences in favor of the plaintiff,[27] and the movant "bears the burden to show that the plaintiff's claims are

---

[23]   _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 555 (2007).

[24]   _Id._ at 570.

[25]   _Iqbal_, 556 U.S. at 663-64 (internal citations omitted).

[26]   _Twombly_, 550 U.S. at 570.

[27]   _See, e.g._, _Alpizar-Fallas v. Favero_, 908 F.3d 910, 914 (3d Cir. 2018).

not plausible."[28]

In weighing a motion to dismiss, the Third Circuit instructs courts to follow a three-part analysis. "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"[29] Second, the court must separate the factual and legal elements of the claim, accepting all of the complaint's well-pled facts as true and disregarding any legal conclusions.[30] Third, the court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.[31] After conducting this analysis, the court may conclude that a claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.[32]

B.    <u>Breach of Contract</u>

Under Delaware law,[33] to state a claim for breach of

---

[28]    <u>UMB Bank, N.A. v. Sun Cap. Partners V, LP (In re LSC Wind Down, LLC)</u>, 610 B.R. 779, 783 (Bankr. D. Del. 2020).

[29]    <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130 (3d Cir. 2010) (quoting <u>Iqbal</u>, 556 U.S. at 675).

[30]    <u>Santiago</u>, 629 F.3d at 130.  <u>See also</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009).

[31]    <u>Santiago</u>, 629 F.3d at 130.

[32]    <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556).

[33]    The Agreement is governed by Delaware law.  Adv. D.I. 3, Ex. A § 12.6.

contract the plaintiff must allege facts sufficient for the court to "plausibly infer: (1) the existence of a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff."[34]

IV.   DISCUSSION

   A.   Breach of Contract

The Debtors' breach of contract claim alleges that USWM breached the Agreement by failing to provide sufficient commercialization efforts for ZIMHI in accordance with the Agreement (the "Commercialization Breach") and that USWM wrongfully withheld information from the Debtors related to its commercialization efforts in contravention of the Agreement (the "Information Breach").

   1.   Commercialization Breach

The Debtors contend that USWM breached the Agreement's requirement that it use commercially reasonable efforts to market and distribute ZIMHI for several reasons.[35]   First, the Debtors allege that USWM failed to adequately launch and market ZIMHI.[36]

---

[34]   Tendyne Holdings, Inc. Securityholders' Representative Comm. v. Abbott Vascular, Inc., No. CV 18-1070-CFC, 2019 WL 2717857, at *2 (D. Del. June 28, 2019) (citing VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003)).

[35]   Adv. D.I. 1 ¶ 1.

[36]   Id. ¶¶ 46-61.

Specifically, the Debtors allege that USWM failed to conduct proper due diligence on the appropriate market prior to ZIMHI's launch.[37]  Further, the Debtors allege that USWM failed to employ adequate staffing to support the marketing of ZIMHI.[38]  Lastly, the Debtors allege that USWM failed to provide a sufficient budget to meet its marketing and distribution obligations under the Agreement.[39]

The Debtors contend that the market for treatments for opioid overdoses was enormous and expanding.[40]  They assert that ZIMHI was uniquely positioned in that market because it is the only commercially available, FDA-approved naloxone product that operates through intramuscular delivery, which the Debtors contend is more convenient, accessible, and effective than comparable intra-nasal delivery naloxone products.[41]  Contrary to the Debtors' expectations, ZIMHI underperformed on the market, and sales declined year-over-year.[42]  The Debtors blame those results on USWM's failure to use commercially reasonable efforts

---

[37]   Id. ¶¶ 55, 58.

[38]   Id. ¶ 56.

[39]   Id. ¶ 57.

[40]   Id. ¶¶ 19-26.

[41]   Id. ¶¶ 27-29, 36.

[42]   Id. ¶¶ 41-45.

to market and distribute ZIMHI.[43]

a.   Do Allegations Identify Specific Provisions of the Agreement that Were Breached?

USWM responds that the Debtors' allegations are conclusory and insufficient to state a claim for breach of the Agreement.[44] USWM asserts that the Complaint does not clearly identify which specific contractual obligations USWM breached[45] and argues that the Debtors do not allege any specific facts from which the Court can plausibly infer that USWM breached the Agreement.  USWM argues that, because the Debtors' allegations are conclusory and lack a sufficient factual basis, USWM lacks fair notice of the nature of the claim mandating its dismissal.[46]

The Court disagrees with USWM's assertion that the Complaint is too vague.  The Complaint alleges that the Agreement required

---

[43]   Id. ¶¶ 46, 55-61.

[44]   Tendyne, 2019 WL 2717857, at *2 (dismissing complaint which had only conclusory allegations and no facts establishing failure to use commercially reasonable efforts).

[45]   See FinancialApps, LLC v. Envestnet, Inc., No. CV 19-1337-CFC-CJB, 2020 WL 4569466, at *3 (D. Del. July 30, 2020) (noting, in dismissing a contract claim, that "Courts applying Delaware law to breach of contract claims have dismissed claims that fail to identify the express contract provision that was breached, and why such a provision was breached."); Berg v. C&H Fin. Servs., Inc., No. 1:23-CV-00181-CFC, 2024 WL 1255504, at *3 (D. Del. Mar. 25, 2024) (dismissing contract claim because amended complaint did "not identify any provision . . . that [defendant was] alleged to have breached.").

[46]   Twombly, 550 U.S. at 555 (requiring that a complaint provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests").

that USWM "develop a commercialization plan and use commercially
reasonable efforts to execute that plan."[47]   The Complaint
contains multiple detailed factual allegations which could
reasonably support a claim that USWM failed to do so with respect
to ZIMHI.[48]

      b.   <u>Do Allegations Assert Breach of Commercially
           Reasonable Efforts as Defined in Agreement?</u>

    USWM argues nonetheless that, even if the Debtors have

---

[47]    Adv. D.I. 1 ¶ 1.

[48]    <u>See, e.g.</u>, <u>id.</u> ¶ 46 ("The reduction in ZIMHI sales was
caused by USWM's reduction in the amount it spent on distribution
and commercialization efforts in conflict with normal and
customary pharmaceutical marketing practices"), ¶ 55 ("USWM
conducted minimal to no pre-marketing activity with respect to
ZIMHI. . . .  USWM provided Plaintiffs with no plan for customer
discovery to identify all potential points of marketing and sale
of ZIMHI.  USWM did not provide any market assessment to allow
for informed allocation of sales personnel across the multiple
and varied market segments for ZIMHI."), ¶ 56 ("USWM assigned an
unreasonably small number of employees [2½ employees] to
commercialize ZIMHI [nationwide] from April 2022 until December
2023."), ¶ 57 ("USWM's marketing budget was woefully inadequate
because Breck Jones, Jr., who was in charge of USWM's ZIMHI
commercialization efforts, took the position that the marketing
budget should only be a proportion of the sales revenue.
Pharmaceutical industry standard, however, is to assign a higher
than average budget for marketing with respect to (a) pre-market
activities, and (b) post-launch years one (1) and two (2), and
only reducing marketing only [sic] once sales are sustained and
are forecasted to grow."), ¶ 58 ("USWM's small sales force was
marketing ZIMHI primarily to addiction clinics, which is a
suboptimal market segment.  Had USWM conducted the necessary pre-
market customer discovery, it would have learned same.  Even
after USWM had learned that addiction clinics were the wrong
target market for ZIMHI, it failed to take corrective action."),
¶ 59 ("the small sales force that USWM had assigned to promote
ZIMHI were focusing the vast majority of their marketing and
sales efforts on another product, Lucemyra [because USWM
incentivized them] to sell Lucemyra, and not ZIMHI.").

stated sufficient factual allegations in the Complaint, those allegations do not support the Commercialization Claim based on the specific definition of commercially reasonable efforts in the Agreement.  USWM notes that the Agreement defines commercially reasonable efforts as the efforts USWM "would normally use to accomplish a similar objective under similar circumstances."[49] In contrast, USWM asserts that the Complaint alleges only that USWM's efforts were not in accordance with the "normal and customary pharmaceutical marketing practices" in the naloxone market generally.[50]  USWM argues that the Debtors' failure to allege how its conduct differed from USWM's normal marketing practices is fatal to the Commercialization Claim.[51]

The Debtors respond that the Complaint contains sufficient factual allegations to sustain its claim that USWM breached the Agreement by failing to market ZIMHI as it normally marketed

---

[49]    The Agreement provides that:
       Commercially Reasonable Efforts means, with respect to
       the efforts to be expended by a Party with respect to
       any objective under this Agreement, reasonable,
       diligent, good-faith efforts to accomplish such
       objective as such Party would normally use to
       accomplish a similar objective under similar
       circumstances exercising reasonable business judgment.
Adv. D.I. 3, Ex. A § 1.18 (the "CRE Provision").

[50]    See, e.g., Adv. D.I. 1 ¶¶ 46, 57.

[51]    See Tendyne, 2019 WL 2717857, at *2-3 (dismissing breach of contract claim where the complaint "fail[ed] to address the Agreement's definition of Commercially Reasonable Efforts" and did "not allege any facts from which the Court may plausibly infer that [defendant] violated this standard.").

drugs.  The Debtors note their allegations that USWM commercialized a similar opioid treatment drug, Lucemyra, in a starkly different manner from its efforts to commercialize ZIMHI.[52]  According to the Debtors, the commercialization of ZIMHI and Lucemyra should have been similar because they target a similar customer base, use a similar sales force, and are similarly designed to address opioid addiction.  Therefore, the Debtors contend that the Court may infer a breach of the CRE Provision from facts alleging that USWM's efforts to commercialize ZIMHI deviated from its efforts for Lucemyra.

USWM argues that the Court cannot consider at this juncture any "facts" regarding the commercialization of Lucemyra which are not contained in the allegations of the Complaint.  USWM asserts that Lucemyra is mentioned in the Complaint only for the limited purpose of claiming that the commercialization of Lucemyra distracted from the commercialization of ZIMHI.[53]

---

[52]   See, e.g., Adv. D.I. 1 ¶ 59 ("the small sales force that USWM had assigned to promote ZIMHI were focusing the vast majority of their marketing and sales efforts on another product, Lucemyra.  Indeed, on sales calls, USWM's sales force responsible for ZIMHI marketing and sales were incentivized to sell Lucemyra, and not ZIMHI. . . .  USWM's marketing efforts of ZIMHI were not to the correct target market and were only secondary to the USWM sales force's principal and incentivized goal of selling Lucemyra."), ¶ 60 ("USWM instructed its employees who were tasked with marketing and selling ZIMHI to instead, focus their sales efforts on Lucemyra.").

[53]   See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988) ("[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to

The Court disagrees with USWM.  The Debtors' allegations that USWM's sales force was incentivized to sell Lucemyra in a different manner from (and instead of) ZIMHI[54]  does plausibly support a claim that USWM did not market ZIMHI by "reasonable, diligent, good-faith efforts . . . as [USWM] would normally use to accomplish a similar objective under similar circumstances exercising reasonable business judgment."[55]  Therefore, the Court finds that the Debtors do allege facts sufficient to support a claim that USWM failed to exercise commercially reasonable efforts to market and distribute ZIMHI as required by the Agreement.

      c.   <u>Do Provisions of the Agreement Preclude Relief?</u>

USWM also argues that the Agreement contains multiple provisions that preclude the Debtors' claims for relief.  First, USWM notes that Schedule F to the Agreement (the "Safe Harbor Provision") provides that USWM will not be in breach of the CRE Provision so long as it expends direct costs for sales and distribution within a specified amount of the Sales and

---

dismiss") (quotations omitted) (citing <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984), <u>cert. denied</u>, 470 U.S. 1054 (1984)).

[54]    Adv. D.I. 1 ¶¶ 59, 60.

[55]    Adv. D.I. 3, Ex. A § 1.18.

Distribution Allocation, a target set by the parties.[56]   USWM asserts that the Debtors fail to allege facts showing that USWM spent less than the Safe Harbor threshold, thereby precluding the Court from inferring a viable claim for breach of the CRE Provision.[57]

Second, USWM contends that the Debtors' allegations are premised largely on the failure of ZIMHI sales to reach the Debtors' projections.   USWM argues that any claim on that basis is also precluded by the Agreement which expressly provides that USWM cannot be held in breach of the Agreement for failing to

---

[56]   Schedule F provides, in relevant part, that: Notwithstanding anything in this Agreement to the contrary, USWM shall not be deemed to be in breach of its Commercial Efforts obligations under this Agreement so long as USWM actually expends direct costs via the Sales and Distribution Allocation in an amount within twenty percent (20%) (e.g., either greater than or less than) of the allocation for the Sales and Distribution Allocation previously determined and agreed by the JPT. Adv. D.I. 3, Schedule F.  The Sales and Distribution Allocation was determined and agreed to by a joint project team ("JPT") comprised of representatives of both the Debtors and USWM.  Adv. D.I. 3, Ex. A § 4.2.1.

[57]   See, e.g., Phunware, Inc. v. Excelmind Grp. Ltd., 117 F. Supp. 3d 613, 625 (D. Del. 2015) (dismissing a breach of contract claim where the contract contained a provision that unambiguously permitted the defendant to abandon the contract despite the complaint's allegations to the contrary).  See also Prewett Enters., Inc. v. Grand Trunk W. R.R. Co., No. 18-CV-04254, 2019 WL 6310495, at *1, *6-8 (N.D. Ill. Nov. 25, 2019) (dismissing an amended breach of contract claim as "fatally flawed" because the contract included a provision permitting parties to withhold payment pursuant to a good faith dispute without being in breach, and the plaintiff's conclusory allegations did not plausibly establish a lack of good faith).

achieve any specific amount of sales.[58]

The Debtors respond that a breach of contract claim under Delaware law does not require that the Debtors anticipate or disprove any potential defenses.[59]  Therefore, the Debtors contend that it is premature for USWM to raise its defenses at the motion to dismiss stage.  The Debtors further argue that their claim that USWM did not use CRE with respect to ZIMHI alone supports the inference that USWM failed to meet the Safe Harbor threshold because sufficient spending would have produced a better outcome.

The Court agrees with the Debtors that USWM's invocation of the Safe Harbor and Sales and Distribution Allocation provisions is premature at this stage because they are affirmative

---

[58]    Section 6.6 of the Agreement provides that:
Disclaimer.  Notwithstanding USWM's obligations to meet the Commercial Efforts set by the JPT, Company acknowledges that USWM makes no further representation, warranty or covenant, either express or implied, that (a) USWM will succeed in Commercializing the Products in the Territory, (b) the Products will achieve any particular sales level, or (c) achievement of any Commercialization Plan guarantees the achievement of any particular future sales level within any given period of time, if at all.
Adv. D.I. 3, Ex. A § 6.6.

[59]    See VLIW Tech., LLC, 840 A.2d 606, 612 (stating that a breach of contract claim requires the plaintiff to state a plausible claim for: "(1) the existence of a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff.").

defenses.[60]  The Debtors have not addressed these issues in their
Complaint and the facts relating to whether those provisions
preclude their claims are contested and not apparent from the
face of the Complaint.  The Court concludes that the Debtors have
stated a breach of contract claim under Delaware law and are not
required to refute every possible affirmative defense in their
Complaint or at the motion to dismiss stage.[61]

       2.   <u>Information Claim</u>

The Debtors also allege that USWM breached the Agreement by

---

[60]    The Third Circuit has stated that:
Technically, the Federal Rules of Civil Procedure
require a defendant to plead an affirmative defense,
like a statute of limitations defense, in the answer,
not in a motion to dismiss.  <u>See</u> <u>Robinson v. Johnson</u>,
313 F.3d 128, 134-35 (3d Cir. 2002).  In this circuit,
however, we permit a limitations defense to be raised
by a motion under Rule 12(b)(6) "only if 'the time
alleged in the statement of a claim shows that the
cause of action has not been brought within the statute
of limitations.'"  <u>Id.</u> (quoting <u>Hanna v. U.S. Veterans'</u>
<u>Admin. Hosp.</u>, 514 F.2d 1092, 1094 (3d Cir. 1975)).
However, "'[i]f the bar is not apparent on the face of
the complaint, then it may not afford the basis for a
dismissal of the complaint under Rule 12(b)(6).'"  <u>Id.</u>
(quoting <u>Bethel v. Jendoco Constr. Corp.</u>, 570 F.2d
1168, 1174 (3d Cir. 1978)).
<u>Schmidt v. Skolas</u>, 770 F.3d 241, 249 (3d Cir. 2014).

[61]    <u>Id.</u>  <u>See also</u> <u>In re Toys "R" Us., Inc.</u>, No. 17-34665-KLP,
2020 WL 2765046, *4-5 (Bankr. E.D. Va. May 26, 2020) (denying
motion to dismiss predicated on affirmative defense based on a
release because ordinarily affirmative defenses are not
appropriately considered on a motion to dismiss) (citing <u>Goodman</u>
<u>v. Praxair, Inc.</u>, 494 F.3d 458, 464 (4th Cir. 2007) (holding that
only "in the relatively rare circumstances where facts sufficient
to rule on an affirmative defense are alleged in the complaint"
should the defense be considered on a motion to dismiss)).

wrongfully withholding information which the Debtors requested.[62] The Debtors contend that the information they requested about USWM's commercialization of ZIMHI is relevant to its claims.  The Debtors suggest that USWM's failure to share this information requires the Court to make a negative inference that USWM did <u>not</u> exercise commercially reasonable efforts in marketing ZIMHI.

USWM responds that the Debtors have not identified any provision of the Agreement it breached by not providing information.  Accordingly, USWM argues that this claim, like the Commercialization Claim, should be dismissed as conclusory.[63] USWM argues that the exchange of the requested information is more appropriate for the discovery phase, and that discovery should be made only in response to a well-pled complaint - not to supply facts necessary to state a claim in the first instance.[64]

The Court agrees with USWM that the Debtors do not allege any facts supporting its claim that USWM was obligated under the Agreement to provide the information the Debtors assert was wrongfully withheld.  Although the Debtors allege that USWM did not adequately respond to their requests for information (which

---

[62]    Adv. D.I. 1 ¶ 62, Exs. B & C.

[63]    <u>See</u> <u>Tendyne</u>, 2019 WL 2717857, at *2-3; <u>Twombly</u>, 550 U.S. at 555.

[64]    <u>See</u> <u>Hydrogen Master Rts., Ltd. v. Weston</u>, 228 F. Supp. 3d 320, 333 (D. Del. 2017) (dismissing contract claim because the complaint did not allege facts plausibly showing damages and instead relied on conclusory statements).

were attached as exhibits to the Complaint),[65] the Debtors
nowhere cite any provision in the Agreement requiring USWM to
provide that information.  Therefore, the Court finds that the
Debtors have not alleged facts sufficient to state a claim that
USWM wrongfully withheld information in contravention of the
Agreement.  Nonetheless, because the Court found that the Debtors
have stated a claim for breach of contract, the Court will not
dismiss that claim.  The Court will, however, allow the Debtors
to amend the Complaint if they wish to rectify this deficiency
and preserve their breach of contract claim based on failure to
provide the requested information.[66]

B.   Damages

USWM also argues that the Debtors' claimed damages are
either expressly barred by the Agreement or are not plausibly
recoverable.  First, USWM claims that any damages for lost sales
in excess of $20 million are barred because the only compensation
the Debtors were entitled to receive under the Agreement were
Milestone Payments that the Agreement capped at that amount.

Second, USWM argues that the asserted damages for lost
market capitalization are consequential damages barred by the

---

[65]   Adv. D.I. 1 ¶ 62, Exs. B & C.

[66]   Fed. R. Civ. P. 15(a)(2).

Agreement[67] because they do not flow directly from the alleged breach.[68]  Rather, USWM argues that the market capitalization damages resulted from an extended sequence of events involving not only the alleged breach of the CRE Provision, but also a decrease in ZIMHI's sales and market share, the Debtors' insolvency, and a decrease in their stock value.

The Debtors respond that USWM erroneously states that the Debtors' profits were capped at $20 million.  Instead, they contend that the Agreement provided that USWM was to pay $20 million in Milestone Payments to the Debtors as well as a percentage of sales.[69]  In addition, the Debtors argue that lost profits are <u>not</u> consequential damages.  Rather, they argue that

---

[67]    Section 8.6 of the Agreement provides, in part, that "neither party shall be liable to the other party or any other person for any special, incidental, <u>consequential</u>, or punitive damages. . . ." (emphasis added).  Adv. D.I. 3, Ex. A § 8.6.

[68]    <u>eCommerce Indus., Inc. v. MWA Intel., Inc.</u>, No. CV 7471-VCP, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013) (citing Black's Law Dictionary's definition of consequential damages as: "losses that do not flow directly and immediately from an injurious act but that result indirectly from the act").

[69]    Adv. D.I. 3, Ex. A § 6.1 ("During the Term, USWM will make: (a) the one-time, non-refundable, non-creditable Near-Term Milestone Payments, and (b) the one-time, nonrefundable, non-creditable Commercial Milestone Payments, both set forth on Schedule B and Schedule C, respectively (collectively the "Milestone Payments") to the Company upon successful completion of the corresponding milestone events."), § 6.2 ("[D]uring the Term of this Agreement, Company will be entitled to a payment from USWM equal to its allocated percentage of Net Profit Share, as more fully set forth on Schedule B attached hereto."), Schedule B ("USWM shall pay Company . . . 50% of the Net Profits.").

those damages are recoverable expectation damages because they are what the Debtors bargained for and would have received under the Agreement but for USWM's breach of the Agreement.  The Debtors note that USWM served as the exclusive distributor of ZIMHI and, therefore, any lost sales or profits from ZIMHI are a direct result of USWM's breach of the Agreement.[70]  Finally, the Debtors argue that any inquiry into the extent and type of damages requires factual determinations that are premature at this stage.[71]

USWM responds that courts have found that it is proper to undertake an analysis, at the pleading stage, of whether certain types of damages are precluded by the Agreement.[72]  It argues

_____

[70]   eCommerce Indus., 2013 WL 5621678, at *47 (holding that lost profits damages in a claim for a breach of a non-compete provision were not consequential damages because they "constitute the benefit for which the protected party bargained").

[71]   See Cilag GmbH Int'l. v. Hospira Worldwide, LLC, No. CV 22-589-RGA-SRF, 2022 WL 17475481, at *4 (D. Del. Dec. 6, 2022) (deferring, on a partial motion to dismiss, a determination of the characterization of damages until after discovery); CrewFacilities.com, LLC v. HotelEngine, Inc., No. 20-1637-RGA, 2021 WL 2649758, at *3 (D. Del. June 28, 2021) (declining to determine the categorization of damages on a motion to dismiss) (citing In re Winstar Commc'ns, Inc., No. 01-01430, 2003 WL 21356090, at *4 (Bankr. D. Del. May 29, 2003) (holding that the Court may classify damages once the plaintiff presents proof of damages at trial)).

[72]   See, e.g., Citisteel USA, Inc. v. Gen. Elec. Co., 78 F. Appx. 832, 835 n.4 (3d Cir. 2003) (finding unpersuasive the plaintiff's argument that the lower court erred by determining that the plaintiff should be barred from seeking consequential damages because, although the complaint never mentioned consequential damages, the allegations of the complaint could be

21

that the Court should do so here to avoid the need for it to
defend against damages that are clearly not recoverable under the
Agreement.

The Court agrees with the Debtors that their claims for lost
sales profits are plausibly recoverable as direct expectation
damages under the Agreement.  The Court concludes that the
Debtors' reading of the Agreement as requiring the payment of the
Milestones as well as Net Sales Profits is a reasonable one,
which the Court must accept as true at this stage of the case.[73]

Further, while the Court agrees with USWM that the Agreement
bars recovery of consequential damages,[74] the Court concludes
that it is premature at this stage to determine whether the
claimed damages for market capitalization losses are
consequential or direct damages.  Rather, the Debtors are
entitled to an opportunity to establish at trial all of their
recoverable damages caused as a result of USWM's alleged breach
of the Agreement.

For all the above reasons, the Court concludes that the
Debtors have stated a claim for breach of the Agreement with
USWM.

read to assert them).

[73]    See, e.g., Alpizar-Fallas, 908 F.3d at 914.  See also supra
note 69.

[74]    Adv. D.I. 3, Ex. A § 8.6.

22

C.   <u>Objection to Claim</u>

The Debtors' claim to disallow USWM's proof of claim is premised entirely on its breach of contract claims.  Because the Court concludes that the Complaint states a claim for breach of contract, the Court concludes that it states a claim to disallow (or reduce) USWM's proof of claim.

V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny the Motion to Dismiss filed by USWM.

An appropriate order is attached.

Dated: April 25, 2025          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

23